STATE OF NORTH CAROLINA v. GEORGE EARL GOODE, JR.

No. 10A94

(Filed 8 September 1995)

## 1. Evidence and Witnesses § 2176 (NCI4th)— expert testimony—specialized knowledge—valid methodology

When a trial court is faced with a proffer of expert testimony, it must determine whether the expert is proposing to testify to scientific, technical, or other specialized knowledge that will assist the trier of fact to determine a fact in issue. This requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is sufficiently valid and whether that reasoning or methodology can be properly applied to the facts in issue.

**Am Jur 2d, Evidence § 1001.**

**Reliability of scientific technique and its acceptance within scientific community as affecting admissibility, at federal trial, of expert testimony as to result of test or**

**STATE v. GOODE**

[341 N.C. 513 (1995)]

study based on such technique—modern cases. 105 ALR Fed. 299.

2. **Evidence and Witnesses §§ 2148, 2154 (NCI4th)— expert testimony—qualification of expert—relevancy**

When the trial court has determined that the method of proof is sufficiently reliable as an area for expert testimony, the court must then determine whether the witness is qualified as an expert to apply this method to the specific facts of the case and, once qualified, whether the expert's testimony is relevant.

**Am Jur 2d, Expert and Opinion Evidence §§ 32-36, 55-67.**

3. **Evidence and Witnesses § 2176 (NCI4th)— scientific method of proof—reliability—expert testimony and judicial notice**

In determining whether a scientific method of proof is reliable, a court may look to testimony by an expert specifically relating to the reliability, may take judicial notice, or may use a combination of the two.

**Am Jur 2d, Evidence § 1001.**

**Reliability of scientific technique and its acceptance within scientific community as affecting admissibility, at federal trial, of expert testimony as to result of test or study based on such technique—modern cases. 105 ALR Fed. 299.**

4. **Evidence and Witnesses § 2210 (NCI4th)— bloodstain pattern interpretation—appropriate area for expert testimony**

A forensic serologist's testimony was sufficient to show that bloodstain pattern interpretation is an appropriate area for expert testimony where the serologist testified that this method is a specialized crime scene technique wherein a specially trained individual studies the blood and types of stains at the crime scene and then, based upon his knowledge of similar bloodstain characteristics and reproductions of the crime scene, he forms an opinion about what actually occurred at the crime scene; in using this method of proof, experts rely upon specific categories of bloodstains which are defined by the way in which they are made; these categories can be established through observation and

reconstruction, as similar stains are produced under similar circumstances; and an expert in the field of bloodstain pattern interpretation would reproduce the bloodstains in order to determine whether his observations and interpretations were correct. Further, bloodstain pattern interpretation was implicitly accepted as a scientific method of proof in *State v. Daughtry*, 340 N.C. 488 (1995).

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**Admissibility, in criminal prosecution, of expert opinion evidence as to "blood splatter" interpretation. 9 ALR5th 369.**

5. **Evidence and Witnesses § 2210 (NCI4th)— bloodstain pattern interpretation—qualification of expert**

The trial court did not err by finding that an S.B.I. agent who was a forensic serologist was qualified to testify as an expert in bloodstain pattern interpretation based upon his education, training, and extensive experience in bloodstain pattern interpretation.

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**Admissibility, in criminal prosecution, of expert opinion evidence as to "blood splatter" interpretation. 9 ALR5th 369.**

6. **Evidence and Witnesses § 2210 (NCI4th)— expert testimony—lack of bloodstains on defendant—no exclusion of participation in stabbings**

The trial court did not err by permitting an expert in bloodstain pattern interpretation to state his opinion that the lack of bloodstains on defendant would not exclude defendant as a participant in the stabbing deaths of the victims based upon the expert's study of autopsy photographs in this case as well as in other cases, his examination of the clothing of the victims and the codefendants in this case as well as in other cases, and his participation in the examination of crime scenes where bloodstains did not occur.

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**Admissibility, in criminal prosecution, of expert opinion evidence as to "blood splatter" interpretation. 9 ALR5th 369.**

**7. Criminal Law §§ 105, 113 (NCI4th)— discovery—blood-stain pattern tests—notice four days before trial—recesses to research and locate expert**

The State did not violate the discovery statute, N.C.G.S. § 15A-903(e), when it informed defense counsel four days prior to trial of its intention to have certain evidence examined by a bloodstain pattern interpretation expert and provided the expert's report to defense counsel during the trial on the same day the State received it. Even if it is assumed that the State failed to comply with the discovery statute, the trial court was not required to exclude the expert's testimony and properly acted within its discretion by ordering a recess to permit defense counsel to research the admissibility of bloodstain pattern interpretation evidence and by offering another recess for the defense to locate an expert witness.

**Am Jur 2d, Depositions and Discovery §§ 426-428, 449.**

**Right of accused in state courts to inspection or disclosure of evidence in possession of prosecution. 7 ALR3d 8.**

**8. Evidence and Witnesses § 2210 (NCI4th)— microscopic quantity of blood on boot—relevancy—probative value**

An expert's testimony about a microscopic quantity of blood discovered on the boot worn by defendant on the night of two murders was relevant to the issue of whether defendant actually participated in the stabbing of the victims and was properly admitted in defendant's murder trial, even though the State could not show the source or type of the blood, where defendant admitted that he was present when the murders occurred but denied that he participated in them. Furthermore, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice since testimony about the bloodstain was not presented in a manner designed to inflame the passions of the jury or otherwise to have an undue tendency to suggest a decision on an improper basis.

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**9. Evidence and Witnesses § 1688 (NCI4th)— photograph of murder victims while alive**

A family photograph of the two murder victims, taken while they were alive, was properly admitted in defendant's murder trial where the photographs were used for illustrative purposes

during testimony by the victim's nephew describing the victims while alive.

**Am Jur 2d, Evidence § 974.**

**Admissibility of visual recording of event or matter other than that giving rise to litigation or prosecution. 41 ALR4th 877.**

10. **Evidence and Witnesses § 309 (NCI4th)— first-degree murder—prior robbery—admissibility to show identity**

Evidence of defendant's participation in a robbery an hour before the robbery and two murders for which defendant was on trial was admissible under Rule 404(b) to show defendant's identity as a perpetrator of the murders where, in both the prior robbery and the crimes against the murder victims, there were at least two individuals involved who incapacitated the victims by pulling their clothing down around their elbows and hands, and at least one person was robbed during both events; the evidence tended to show that defendant punched the prior robbery victim in the face and that the male murder victim had "areas of abrasion and bruising on his face"; and the similar acts and close proximity in time thus tend to indicate that the same person was involved in both the prior robbery and the murders. Furthermore, the probative value of defendant's involvement in the prior robbery outweighs any potential for unfair prejudice. N.C.G.S. § 8C-1, Rules 404(b), 403.

**Am Jur 2d, Evidence § 423.**

**Admissibility, in robbery prosecution, of evidence of other robberies. 42 ALR2d 854.**

11. **Evidence and Witnesses § 179 (NCI4th)— murder—statements in letter—admissibility to show motive**

In light of testimony that immediately prior to stabbing a murder victim, defendant speculated that the victim had been "messing around" with his wife, defendant's statements in a letter to his wife regarding his anger and desire to kill someone as a result of his wife cheating on him, written four days prior to the murder, were relevant to show a motive for defendant's killing of the victim, and the State was properly permitted to cross-examine defendant about this letter.

**Am Jur 2d, Evidence § 558.**

**12. Evidence and Witnesses § 3027 (NCI4th)— cross-examination of defendant—prior false statements**

The trial court properly permitted the State to cross-examine defendant pursuant to Rule 608(b) about false statements defendant made to hospital personnel and his commanding officer less than a year before the murders for which he was on trial since those statements are highly probative of defendant's character for truthfulness. N.C.G.S. § 8C-1, Rule 608(b).

**Am Jur 2d, Witnesses §§ 901-904, 968.**

**13. Criminal Law § 450 (NCI4th)— closing argument—he who runs with pack—acting in concert illustration—no impropriety**

The trial court did not err by failing to intervene *ex mero motu* when the prosecutor stated during his closing argument in a first-degree murder prosecution that "he who runs with the pack is responsible for the kill", where this statement was used to illustrate acting in concert, and there was ample evidence to support this theory as one basis for defendant's guilt.

**Am Jur 2d, Trial §§ 648, 681.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

**14. Criminal Law § 1363 (NCI4th)— capital sentencing—accomplice's criminal record—not mitigating circumstance**

The trial court did not err by excluding evidence of a codefendant's criminal record as a nonstatutory mitigating circumstance in this capital sentencing proceeding since an accomplice's criminal record has no bearing on defendant's character or propensity to commit the murder and does not qualify as a mitigating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**15. Criminal Law § 1363 (NCI4th)— capital sentencing—lingering doubt of guilt—improper mitigating circumstance**

Lingering doubt as to defendant's guilt is not a proper nonstatutory mitigating circumstance for submission to the jury in a capital sentencing proceeding.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**16. Criminal Law § 450 (NCI4th)— capital sentencing—closing argument—murders as "feeding frenzy"—supporting evidence**

The trial court did not err by failing to intervene *ex mero motu* when the prosecutor referred to two murders as a "feeding frenzy" where the prosecutor was emphasizing the brutality and senselessness of the murders of an elderly and defenseless couple, and this analogy was supported by evidence that the victims were unsuspecting of the attack, unarmed, and stabbed repeatedly and that the victims' clothing was ripped and in disarray, with the only apparent gain of the defendant and his accomplices being a wallet and its contents.

**Am Jur 2d, Trial §§ 648, 681.**

**17. Criminal Law § 1373 (NCI4th)— death penalty not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant, where the jury convicted defendant on both the theory of malice, premeditation, and deliberation in both of the murders, and also on the theory of felony murder in one of the murders; the jury found the aggravating circumstances that both murders were especially heinous, atrocious, or cruel, that the murders were part of a course of conduct including other violent crimes, and that the murder involving the felony was committed while defendant was engaged in an armed robbery; and the elderly victims, who were unsuspecting of the attack, unarmed, and stabbed repeatedly, would have been no match for the physical strength of defendant, a twenty-two-year-old man, and his accomplices.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Ellis, J., at the 1 November 1993 Criminal Session of Superior Court, Harnett County, upon a jury verdict of guilty of two counts of first-degree murder.

STATE v. GOODE

[341 N.C. 513 (1995)]

Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for robbery with a dangerous weapon was allowed 19 September 1994. Heard in the Supreme Court 11 May 1995.

*Michael F. Easley, Attorney General, by Tiare B. Smiley, Special Deputy Attorney General, for the State.*

*J. Clark Fischer for defendant-appellant.*

ORR, Justice.

This case arises out of the stabbing deaths of Leon and Margaret Batten. At the time of the murders, Mr. Batten was the landlord of the trailer park in which defendant resided with his wife. On 30 March 1992, defendant was indicted for two counts of first-degree murder and one count of robbery with a dangerous weapon. Defendant was tried before a jury, and on 19 November 1993, the jury found defendant guilty of all charges. Following a capital sentencing proceeding, the jury recommended sentences of death for the murder convictions. In accordance with the jury's recommendation, the trial court entered one sentence of death for the first-degree murder conviction based on the theory of premeditation and deliberation and the felony murder theory, one sentence of death for the first-degree murder conviction based solely on the theory of premeditation and deliberation, and a sentence of forty years' imprisonment for the robbery with a dangerous weapon conviction.

After consideration of the assignments of error brought forward on appeal by the defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial free from prejudicial error. For the reasons set forth below, we affirm his convictions and sentences.

At trial, the State's evidence tended to show the following: Glen Troublefield testified that on 29 February 1992, defendant arrived at his apartment between 4:00 and 5:00 p.m. accompanied by defendant's brother, Chris Goode, and Eugene DeCastro. After talking for a short while, the four men left for a club in a Nissan Maxima driven by defendant. Leonard Wiggins, a resident of Selma, North Carolina, testified that this same night at approximately 6:20 p.m., he observed defendant in the Maxima on Kay Drive. Wiggins testified that defendant stopped the car, got out, approached him, and asked, "Don't I know you?" Wiggins further testified that he replied, "No, I do not

know you." Defendant then punched him in the eye and along with DeCastro robbed him of his jacket and necklace. Troublefield testi-fied that at this time, he heard Wiggins yell, "Help, I'm being robbed," and that defendant and DeCastro returned to the car carrying a jacket and necklace belonging to Wiggins.

Troublefield also testified that after defendant returned to the car, he began driving in an erratic manner and lost control of the car, which ended up in a ditch. After it was removed from the ditch, defendant drove to a store where the men purchased a bottle of wine. Troublefield testified that defendant resumed driving and shared the bottle of wine with Chris Goode and DeCastro. Thereafter, defendant again drove the car into a ditch. Troublefield testified that at this time, defendant, Chris Goode, and DeCastro were near a trailer. Troublefield exited the car and began running in the opposite direction.

James Adams testified that on 29 February 1992, he was a resi-dent of the Dallas Mobile Home Park. Adams testified that between 7:15 and 7:30 p.m., he observed a black man in a trailer he knew to be unoccupied. He then notified the landlord, Mr. Batten, about his observation, and Mr. Batten followed him back to the trailer. As Mr. Batten approached the trailer, Adams observed someone go into the trailer and get something off the "eating table." Thereafter, Adams returned to his trailer and sat in his vehicle for approximately ten minutes before returning to the trailer where Mr. Batten was. As he approached the trailer, Adams observed four black men beating Mr. Batten, and he heard Mr. Batten crying out, "Help me. Help me. Please help me." Adams then left to go get help.

Levi Snead testified that when he arrived at the Dallas Mobile Home Park between 7:15 and 7:30 p.m. on 29 February 1992, he observed "three or four guys outside [a] trailer with the door wide open." They appeared to be "scuffling," and the person on the ground looked like he was trying to get up. Snead went to the Batten house to notify Mr. Batten of the trouble at his trailer park. Mr. Batten's wife, Margaret Batten, answered the door and informed him that she thought her husband was already at the trailer park. Snead then left to report the disturbance to a deputy sheriff. Snead testified that on his way to notify the sheriff, he passed Margaret Batten heading toward the trailer park.

Detective Michael Bass of the Johnston County Sheriff's Department testified that on 29 February 1992 at 7:33 p.m., he

responded to a call concerning a disturbance at the Dallas Mobile Home Park. Detective Bass testified that when he arrived on the scene, he observed three black males, one of whom he identified as defendant, between a Toyota truck and a Buick parked in the yard of a trailer. As Detective Bass exited his patrol car, the three males fled the scene. At this time, Detective Bass found the bodies of Leon and Margaret Batten in the bed of the truck. Detective Bass observed Mr. Batten lying on his right side, with his head elevated slightly because of the fender wheel in the back of the truck. Mrs. Batten's shirt had been removed, her bra was up above her breast area, and she was bleeding heavily from her chest area. There was no pulse on either victim.

Lieutenant Ron Reynolds testified that on 29 February 1992 at 7:33 p.m., he was on patrol when he heard Detective Bass' dispatch regarding the trailer park and received a description of the three black men who had fled the crime scene. While on his way to assist in the call, he noticed a black man walking at a fast pace away from the trailer park, looking back over his shoulder. When the man refused to talk to Lieutenant Reynolds, he placed the man in his patrol car and transported him back to the trailer park. The man was later identified as defendant. The other two suspects were also eventually apprehended. Reynolds further testified that police officers recovered a wallet containing Mr. Batten's identification cards and money during their search of defendant.

Patrick Byrd, an acquaintance and former jailmate of defendant, testified that on approximately 22 December 1992, defendant approached him while he was in his cell in the Johnston County jail. Byrd testified that defendant informed him that he was charged with murder. Byrd further testified that defendant told him that on the night of the murders, DeCastro and defendant's brother were in his trailer with him "drinking [and] smoking weed."

On direct examination by the prosecutor, Byrd further testified:

A. [Defendant] told me then the rent man came. He come [sic] to collect the rent cause they was [sic] a couple months behind. Then he speculated—told me he speculated that the rent man was messing around with his wife and they started fussing, you know.

Q. Who started fussing?

A. Mr. Goode, George.

**STATE v. GOODE**

[341 N.C. 513 (1995)]

Q.   And who was he fussing with?

A.   Mr. Batten.

Q.   Go ahead.

A.   Then he took him—DeCastro, took and hit him, he told me.

Q.   Hit who?

A.   Mr. Batten. Then he say [sic] he pull out the knife and started stabbing him.

Q.   Who pulled out the knife?

A.   George.

Q.   Stabbed who?

A.   Mr. Batten.

Q.   Did he tell you anything else?

A.   Yes, sir.

Q.   Tell us about it.

A.   Then he took him and put him in the back of the truck. While they were doing that his wife pulled up.

Q.   Whose wife pulled up?

A.   Mr. Batten's wife.

Q.   Did he tell you what happened after that?

A.   She got out and saw what happened, started hollering, you know, so they grabbed her.

Q.   Did he tell you any more about that?

A.   No. He told me they started messing with her.

Dr. Deborah Radisch, Associate Chief Medical Examiner of the State of North Carolina, was tendered and qualified as an expert in the field of forensic pathology. Dr. Radisch testified that she performed autopsies on the bodies of the victims on 1 March 1992. Dr. Radisch further testified that during the autopsy of Margaret Batten, she observed multiple injuries, including stab wounds in the chest, abdomen, head, and neck; six or seven broken ribs; and cuts through the esophagus, stomach, large intestine, spleen, right kidney,

and liver. A total of twenty-three distinct stab wounds was found on Margaret Batten. Dr. Radisch also found several "defensive" wounds located on the backs of Mrs. Batten's hands. Dr. Radisch testified that in her opinion, the cause of death was multiple stab wounds to Mrs. Batten's chest and abdomen.

Dr. Radisch testified that during her autopsy of Leon Batten, she again observed multiple injuries, including four stab wounds to his chest and back, puncture wounds, bruising, areas of abrasion, bruising about his head and face, and several broken ribs. The cause of death was determined to be a stab wound to the left chest.

State Bureau of Investigation Special Agent Duane Deaver, who was proffered as an expert in the field of forensic serology and blood-stain pattern interpretation, testified that although he found no visible bloodstain located on defendant's boots, a chemical test indicated the presence of blood, the type of which could not be determined. Agent Deaver did not detect any visible bloodstains on defendant's coveralls, hat, or boxer shorts. It was Agent Deaver's opinion that the absence of blood on any of defendant's clothing had no exculpatory effect.

Ralph Richardson, a former Marine and friend of defendant, testified that in March 1991, he gave defendant a Gerber brand knife with an interchangeable blade. He testified that the knife found at the crime scene and the knife he gave defendant were very similar and that he could not detect any differences. Testimony showed that the knife was capable of causing the stab wounds on the bodies of both victims.

Defendant also presented evidence during the trial. Defendant testified that on 29 February 1992, he and his brother were on their way to Johnston County when they saw DeCastro on the side of the road and picked him up. They arrived in Smithfield at approximately 5:30 p.m. and went to visit Glen Troublefield. Defendant testified that they had a few beers earlier in the afternoon and that he had a glass of gin at Troublefield's house.

The four men then left Troublefield's apartment. Defendant testified that as they approached a stop sign on Kay Drive, defendant thought he saw someone he knew, so he stopped and got out. Defendant testified that he approached the man, asked him a question, and when the man did not reply, defendant punched him and grabbed his coat. Defendant resumed driving, lost control of the car,

and ran the car into a ditch. After having his car pulled out of the ditch by a friend, defendant drove to a nearby store, where he picked up the other three individuals who had walked there to wait for him. Defendant testified that they arrived at a club called "Red Avery's" shortly thereafter "but there wasn't [sic] too many people there" so they decided to go to defendant's trailer.

On the way to the trailer, defendant again drove his car into a ditch. Defendant testified that they could not remove the car from the ditch and that all four of them, including Troublefield, walked the rest of the way to defendant's trailer. Defendant testified that at the trailer, the four of them began drinking and that he consumed about a glass of wine. Thereafter, the men moved outside. After defendant spoke briefly with Deborah Atkinson, a friend of defendant's wife, Leon Batten pulled up in a car. Defendant testified that he informed Mr. Batten he was going to move out of the trailer and that he then went inside the trailer to get his tape player.

Defendant testified that while he was inside his trailer, he heard Mr. Batten "holler." Defendant went back outside, where he found his brother, DeCastro, and Troublefield beating Mr. Batten while he lay on the ground. Defendant testified that he became scared and confused and turned to walk away. Defendant further testified that he refused to help move the body of Mr. Batten and that at that time, he also discovered Troublefield was missing. Defendant then observed Mrs. Batten drive up to the trailer. Defendant testified that DeCastro began to stab Mrs. Batten with "some sort" of butcher knife when she exited the car and ran over to her husband. Defendant then saw Detective Bass arrive on the scene, and the three men fled. After he and his brother separated, an officer stopped defendant, patted him down, handcuffed him, and took him back to the trailer park.

After arguments of counsel and instructions by the trial court, the jury returned verdicts finding the defendant guilty of two counts of first-degree murder and one count of robbery with a dangerous weapon. Thereafter, the trial court conducted a separate capital sentencing proceeding for the murder conviction pursuant to N.C.G.S. § 15A-2000.

During the sentencing proceeding, the State presented additional evidence. Dr. Deborah Radisch, the Associate Chief Medical Examiner of North Carolina, was recalled to the stand and testified that the three stab wounds to Mr. Batten's back by themselves were not fatal and that the stab wound to his chest was not immediately

fatal because it was on the right side of his heart, which is not the strong pumping chamber of the heart. Dr. Radisch testified that it would have taken Mr. Batten about three minutes to have been rendered unconscious and about five to ten minutes to die as a result of the chest wound.

Dr. Radisch also testified concerning the multiple stab wounds to the body of Mrs. Batten. She testified that based on the amount of blood within Mrs. Batten's body cavity, she was still alive when most of the wounds, "if not all" of them, were inflicted. Dr. Radisch further testified that Mrs. Batten would have experienced pain not only from the stab wounds, but her breathing would have been painful and difficult due to her broken ribs. Dr. Radisch estimated that Mrs. Batten lived for about five to ten minutes after receiving the wounds.

Defendant also presented evidence during the sentencing proceeding. Defendant testified that he quit school in the eleventh grade. He testified that he worked at Wendy's, Trade Mart, and Wood Pest Control prior to enlisting in the Marines. He received his high school diploma from Johnston Technical College. Defendant further testified that he had a close and loving relationship with his family and had never been convicted of any other criminal offense.

Peggy Leonard, a former employer of defendant's, testified that in the summer of 1988, she hired the defendant to work in the convenience store she managed. She also testified that defendant was always friendly and respectful towards her and the customers.

Mary Louise Pully, defendant's grandmother, testified that defendant was a quiet and respectful child. Deborah Goode, defendant's aunt, testified that defendant had been raised in the church and was a talented musician. Oralee Privett, another aunt, gave similar testimony.

## GUILT-INNOCENCE PROCEEDING

### I.

Defendant's first assignment of error concerns expert testimony by SBI Special Agent Duane Deaver on bloodstain pattern interpretation. Generally, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." N.C.G.S. § 8C-1, Rule 402 (1992). Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the

determination of the action more or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992).

Specifically, the admissibility of expert testimony is also governed by Rule 702 of the North Carolina Rules of Evidence, which states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702 (1992). Preliminary questions concerning the qualifications of a witness to testify and the admissibility of evidence shall be determined by the trial court. N.C.G.S. § 8C-1, Rule 104(a) (1992).

[1] Thus, under our Rules of Evidence, when a trial court is faced with a proffer of expert testimony, it must determine whether the expert is proposing to testify to scientific, technical, or other specialized knowledge that will assist the trier of fact to determine a fact in issue. As recognized by the United States Supreme Court in its most recent opinion addressing the admissibility of expert scientific testimony, this requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is sufficiently valid and whether that reasoning or methodology can be properly applied to the facts in issue. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 125 L. Ed. 2d 469 (1993).

In *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984), this Court, addressing the reliability of footprint identification, gave a comprehensive review of the law concerning the determination of whether a proffered method is sufficiently reliable. Speaking for the Court, Justice Frye restated the following rule, which is applicable in assessing the reliability issue:

> "In general, when no specific precedent exists, scientifically accepted reliability justifies admission of the testimony of qualified witnesses, and such reliability may be found either by judicial notice or from the testimony of scientists who are expert in the subject matter, or by a combination of the two."

*Id.* at 148, 322 S.E.2d at 381 (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 86, at 323 (2d ed. 1982)). Further, in

*Bullard,* this Court recognized the application of this rule in *State v. Rogers,* 233 N.C. 390, 64 S.E.2d 572 (1951), where we "took judicial notice of the fact that fingerprinting was sufficiently established." *Bullard,* 312 N.C. at 145, 322 S.E.2d at 379.

In *State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990), Justice Whichard also examined the reliability of a scientific method of proof setting out the following principles:

> Reliability of a scientific procedure is usually established by expert testimony, and the acceptance of experts within the field is one index, though not the exclusive index, of reliability. *See State v. Bullard,* 312 N.C. at 147, 322 S.E.2d at 380; *State v. Peoples,* 311 N.C. 515, 532, 319 S.E.2d 177, 187 (1984). Thus, we do not adhere exclusively to the formula, enunciated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), and followed in many jurisdictions, that the method of proof "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. Believing that the inquiry underlying the *Frye* formula is one of the reliability of the scientific method rather than its popularity within a scientific community, we have focused on the following indices of reliability: the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked "to sacrifice its independence by accepting [the] scientific hypotheses on faith," and independent research conducted by the expert. *State v. Bullard,* 312 N.C. at 150-51, 322 S.E.2d at 382.

*Pennington,* 327 N.C. at 98, 393 S.E.2d at 852-53.

*Pennington* involved the reliability of the DNA profiling process. Expert testimony on this issue was given by a professor of genetics and microbiology, a forensic serologist, a staff scientist at Cellmark, and an assistant professor of microbiology. These experts testified as to their background and experience in the field of DNA profiling and the established techniques used in this field. In addition, the Court noted that these experts used visual aids in their testimony. This Court held that the expert testimony "established the reliability of the DNA profiling process" and "that the evidence of the DNA profile testing results was[, therefore,] properly admitted." *Id.* at 100, 393 S.E.2d at 854. For examples of cases in which this Court has held that the method of proof was not sufficiently reliable, *see State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (holding hypnosis is an unreliable scientific

process), and *State v. Foye*, 254 N.C. 704, 120 S.E.2d 169 (1961) (holding polygraph testing not acceptable as an instrument of evidence in criminal cases).

[2] Once the trial court has determined that the method of proof is sufficiently reliable as an area for expert testimony, the next level of inquiry is whether the witness testifying at trial is qualified as an expert to apply this method to the specific facts of the case. N.C.G.S. § 8C-1, Rule 702. "It is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession." *State v. Evangelista*, 319 N.C. 152, 164, 353 S.E.2d 375, 384 (1987) (citing *Bullard*, 312 N.C. at 140, 322 S.E.2d at 376; *State v. Phifer*, 290 N.C. 203, 225 S.E.2d 786 (1976), *cert. denied*, 429 U.S. 1050, 50 L. Ed. 2d 766, *and cert. denied*, 429 U.S. 1123, 51 L. Ed. 2d 573 (1977)). "It is enough that the expert witness 'because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.' " *Id.* at 164, 353 S.E.2d at 384 (quoting *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E.2d 905, 911 (1978)). Further, "the trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony." *Bullard*, 312 N.C. at 140, 322 S.E.2d at 376.

Finally, once qualified, the expert's testimony is still governed by the principles of relevancy. As previously stated, relevant evidence is defined as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. Further, in judging relevancy, it should be noted that expert testimony is properly admissible when such testimony can assist the jury to draw certain inferences from facts because the expert is better qualified than the jury to draw such inferences. *Bullard*, 312 N.C. at 139, 322 S.E.2d at 376. Having set out the specific guidelines trial courts are to follow in determining the admissibility of expert testimony, we now must apply these guidelines to the issue presented.

In the present case, defendant's specific assignments of error regarding the expert testimony are (1) that the trial court erred in qualifying Agent Deaver as a purported bloodstain pattern interpretation expert, and (2) that the admission of this testimony constituted an alleged due process violation. However, defendant also contends in his brief that "blood spatter interpretation" is not an appropriate area for expert testimony, as it has not been established as scientifi-

cally reliable. Although defendant did not specifically object to this at trial, we will in our discretion address this issue because of the gravity of this case. We note, however, that the actual scientific method of proof involved in this case is "bloodstain pattern interpretation."

## A.

First, we will address defendant's contention that bloodstain pattern interpretation is not an appropriate area for expert testimony. Defendant argues that because this area has not been established as a scientifically reliable field, it does not qualify as an area for expert testimony. We disagree.

[3] "A new scientific method of proof is admissible at trial if the method is sufficiently reliable." *Pennington*, 327 N.C. at 98, 393 S.E.2d at 852 (citing *Bullard*, 312 N.C. at 148, 322 S.E.2d at 381). As stated above, in determining reliability, a court may look to testimony by an expert specifically relating to the reliability, may take judicial notice, or may use a combination of the two. *Bullard*, 312 N.C. at 148, 322 S.E.2d at 381 (quoting 1 *Brandis on North Carolina Evidence* § 86, at 323). In the present case, Agent Deaver, a forensic serologist, testified extensively on *voir dire* concerning the reliability of bloodstain pattern interpretation.

[4] Agent Deaver testified that bloodstain pattern interpretation is a "specialized crime scene technique" wherein a specially trained individual studies the blood and the types of stains at the scene of the crime, and then, based upon his knowledge of similar bloodstain characteristics and reproductions of the crime scene, he forms an opinion about "what actually occurred [at] the crime scene." In order to determine what occurred at the crime scene using this method of proof, experts rely upon specific categories of bloodstains which are defined by the way in which they are made. These categories can be established through observation and reconstruction, as similar stains are produced under similar circumstances. Further, Agent Deaver testified that the expert in the field of bloodstain pattern interpretation would reproduce the bloodstains in order to determine whether their observations and interpretations were correct. Our review of Agent Deaver's testimony leads us to conclude that it is sufficient to show that bloodstain pattern interpretation is an appropriate area for expert testimony.

Further, this Court implicitly accepted bloodstain pattern interpretation as a scientific method of proof in *State v. Daughtry*, 340

**STATE v. GOODE**

[341 N.C. 513 (1995)]

N.C. 488, —— S.E.2d ——, 1995 WL 444437 (1995), as did the Court of Appeals in *State v. Willis*, 109 N.C. App. 184, 426 S.E.2d 471, *disc. rev. denied*, 333 N.C. 795, 431 S.E.2d 29 (1993). We also note that appellate courts in other jurisdictions have reached the same conclusion and result in finding bloodstain pattern interpretation as an appropriate area for expert testimony. *State v. Rodgers*, 119 Idaho 1047, 812 P.2d 1208 (1991); *Fox v. State*, 506 N.E.2d 1090 (Ind. 1987); *State v. Hall*, 297 N.W.2d 80 (Iowa 1980), *cert. denied*, 450 U.S. 927, 67 L. Ed. 2d 359 (1981); *Farris v. State*, 670 P.2d 995 (Okla. Crim. App. 1983); *State v. Melson*, 638 S.W.2d 342 (Tenn. 1982), *cert. denied*, 459 U.S. 1137, 74 L. Ed. 2d 983 (1983); *Compton v. Commonwealth*, 219 Va. 716, 250 S.E.2d 749 (1979).

[5] Next, we address defendant's specific assignment of error relating to the qualification of Agent Deaver as a purported expert in bloodstain pattern interpretation. First, our review of Agent Deaver's qualifications shows that he was properly qualified as an expert to testify in this area. The record indicates that Agent Deaver has extensive experience in the field of bloodstain pattern interpretation. The following testimony during the *voir dire* of Agent Deaver illustrates his background:

Q. Have you been employed during your entire [career] with the Bureau in the position of a forensic serologist?

A. Yes, I do have other assignments within the Bureau, but my specific title is a forensic serologist.

Q. What is your educational background?

A. I have a bachelor of science degree from North Carolina State University. At such time that I was employed with the SBI I was sent to the 17th SBI Academy where I was trained as a special agent. Upon completion of that course of study, I was then entered into the crime laboratory in an in-house training program for forensic serology. In the middle of that course of study, I was asked to take on an additional expertise which was blood spatter interpretation[,] which I accepted[,] and I was sent to schools also in that area to complete a course of study in that area. I have been sent to various areas throughout the United States for training. To the University of New Haven in Connecticut in serology. I was sent for training in blood spatter pattern interpretation or blood stain analysis to the Mid-Western Association of Forensic Science. That course was put on by the Minnesota Bureau of

Criminal Apprehension. That was a basic course. After completion of that course I was sent to an advanced course offered by Valencia College in Florida. I then, during that period of time[,] completed my serology training and began course work in the area of serology and also blood stain pattern interpretation.

Since that time I have been involved in the SBI with the specialized crime scene team that goes out and investigates homicides. I'm also an instructor for the State of North Carolina certified in the area of law enforcement instruction. I do teach about serology and blood stain pattern interpretation for the State of North Carolina to SBI agents, responsible for criminal training of North Carolina State Highway Patrol, and also for local agencies, I provide training for Sheriff's Departments and Police Departments throughout the State of North Carolina.

Further, the trial court reasonably could have believed that Agent Deaver's experience and research placed him in a better position than the jury to testify regarding bloodstain pattern interpretation. Thus, the trial court did not err in qualifying Agent Deaver as an expert in this area.

[6] Defendant also specifically challenges Agent Deaver's testimony concerning his opinion as to the lack of blood on defendant. The pertinent portion of the objectionable testimony proceeded as follows:

Q. Agent Deaver, do you have an opinion satisfactory to yourself based on your experience and examination of the items that you've seen in this case whether or not you would necessarily exclude a certain individual as a participant in a stabbing type of assault simply because such person did not have any visible blood stains on his clothing?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Yes, I do have an opinion to that.

Q. What is the basis for your opinion?

A. The basis for my opinion first, in general terms would be my experience. My experience comes from having looked at a great number of scenes and also from having done testing involving beatings, shootings, and those type of things. And so my experience generally would be [sic] I would be able to answer that ques-

tion in general terms. What I need [sic] to do in this specific case was to look at the specific circumstances surrounding this case to see what one might expect to find. What types of stain, who might have the stains on them or what might they be on in order to form an opinion as to this specific case.

Q.   To your satisfaction, have you been able to examine all those areas?

A.   Yes, I have.

Q.   Agent Deaver, I then ask your opinion about whether you could necessarily exclude someone simply because they did not have blood on them?

A.   Generally, I would not. I have seen enough cases where I have been able to reconstruct the circumstances that were given to me and was able to determine that bloodstain did not occur as one might expect from an individual involving those circumstances. Specifically, in this case, after having looked at these items of evidence, the crime scene and the autopsy, again my opinion would be that one could not be excluded from having inflicted at least some of the injuries on these individuals simply because they do not have blood staining on their clothes.

There is no doubt this testimony is critical to defendant, as it relates directly to the issue of whether the defendant actually participated in the murders. Although defendant admitted his presence at the time the murders were committed, he denied participation in the stabbing deaths. Defendant contends that the testimony of Agent Deaver was "totally unnecessary and thus inadmissible under Rule 702," as the jury could have reached its own conclusions on the matter. However, the testimony of Agent Deaver prior to the above statements clearly shows that he was in a better position than the jury to draw conclusions from the presence or absence of blood on defendant.

Q.   . . . Agent Deaver, if you would, can you describe for the members of the jury in the court the factors that determined whether or not blood stain occurs.

A.   Well, there has to first—it may seem fairly simple but there has to be a source of blood present. . . . In other words, there can be a tremendous fight or injuries [of] some kind that blood stain does not occur, blood spatter interpretation is not worthwhile. . . .

STATE v. GOODE

[341 N.C. 513 (1995)]

. . . Very rarely does an initial injury create blood stains either on anything that's present in the crime scene or anything around it—around the injuries themselves. That's true of gun shots, it's true of beatings, it's true of stabbings, it's true of most injuries. Because one must remember that a body is not, for instance, I use this example, a water balloon is filled with blood. It doesn't instantly explode when punctured creating blood stains.

What happens is that an injury creates internal injuries that create blood. We have a vascular system, made up of arteries, veins, heart, those type of things. When they are injured, then the blood stain begins to occur. And that blood stain occurs internally first. If one, for instance, was to beat someone. You can beat a person in the head fairly severely for a while but until those internally [sic] injuries, injuries to the head or the brain cause blood to be on the outside of the head, you don't create blood stain. . . . You have to have a very traumatic injury.

Q. If I understand you correctly, it would have to be some blood or successive blows to come in contact with?

·A. That's correct. I also, if I might, clothing is also important to this also. Not only are injuries internal but even when it comes to surface, if there's clothing present, it also prevents a lot of stains many times and, of course the amount of clothing, the type of clothing would indicate how much staining you could expect. . . .

Q. Any other factors that you're familiar [with] to the fact whether the blood stain will or will not occur?

A. Well, particular injuries, that's always very important. That's why I ask for autopsy reports so that I can see what type of injuries are present.

Thus, due to Agent Deaver's study of autopsy photographs in this case as well as in other cases, examination of the clothing of the victims and codefendants in this case as well as in other cases, and participation in the examination of crime scenes where bloodstains did occur and other cases where bloodstains did not occur, we conclude his testimony was properly admitted to aid the jury in making its determination.

In addition, the question of whether an absence of blood on defendant should exculpate him is clearly relevant to the case, as defendant's theory of the case is that he was at the scene of the crime

as the murders were being committed but took no actual part in the killings. "Once properly admitted, the weight to be given the evidence was a decision for the jury." *State v. Whiteside*, 325 N.C. 389, 398, 383 S.E.2d 911, 916 (1989). Further, during defendant's cross-examination of Agent Deaver, he was able to elicit testimony that it is "certainly a possibility if you haven't been involved in violence of some kind you would expect that there would be no blood on you," which, in fact, supported defendant's version of the events occurring the night of the murder. Thus, not only did defendant have the opportunity to thoroughly cross-examine Agent Deaver regarding the absence of blood on defendant, but he was also able to elicit favorable testimony from him. Accordingly, defendant's assignment of error is without merit.

B.

[7]   Defendant's final specific assignment of error regarding bloodstain pattern interpretation is that his due process rights were violated because he was not given adequate notice of the expert's report and was, therefore, unable to conduct a meaningful cross-examination.

N.C.G.S. § 15A-903(e) provides:

(e) Reports of Examinations and Tests.—Upon motion of a defendant, the court must order the prosecutor to provide a copy of or to permit the defendant to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecutor. In addition, upon motion of a defendant, the court must order the prosecutor to permit the defendant to inspect, examine, and test, subject to appropriate safeguards, any physical evidence, or a sample of it, available to the prosecutor if the State intends to offer the evidence, or tests or experiments made in connection with the evidence, as an exhibit or evidence in the case.

N.C.G.S. § 15A-903(e) (1988).

The record reflects the fact that on 27 October 1993, four days prior to trial, the prosecution informed counsel for the defense of its intention to have certain pieces of evidence examined in order to develop expert opinion. The expert's written report was given to the State on 8 November 1993 and turned over to the defense late that

afternoon. Four days later a *voir dire* of Agent Deaver was conducted. The court then recessed for a day, and the judge delayed ruling on the admission of the bloodstain pattern interpretation testimony in order to give defense counsel time to research the issue. The court concluded that the State had turned over the report by Agent Deaver as required by N.C.G.S. § 15A-903(e). Agent Deaver's testimony was delayed while the State called two other witnesses. At this point, the court offered another recess in order for defendant to locate an expert witness. Defense counsel stated, "To tell you the truth, I don't know that we really need any recess. We've called everybody I could get up with, and nobody knows anybody, private detectives or the Death Penalty Resource Center or even other lawyers." A ten-minute recess was given after which defense counsel elected to hold a *voir dire* on Agent Deaver's qualifications. Trial then continued, and the complained-of evidence was offered.

In a similar case, *State v. McCoy*, 303 N.C. 1, 277 S.E.2d 515 (1981), this Court found no error where the State did not provide ballistics test results to the defendant until the third day of trial. In *McCoy*, as in this case, the State was not aware of the evidence until several days prior to trial and immediately notified defendant's counsel. Also in that case the defense counsel noted, "I've looked for ballistics experts before and there are just not any," and doubted that he could locate such an expert within a reasonable time. *Id.* at 21, 277 S.E.2d at 530.

"We find no error in this procedure. Even if we assume, for purposes of argument, that the [S]tate failed to comply with the discovery statute, exclusion of evidence is but one of several sanctions authorized by N.C.G.S. § 15A-910. Another is to 'grant a continuance or recess.' " *Id.* "The sanction to be imposed rests in the trial judge's sound discretion and, absent abuse, is not reviewable on appeal." *Id.* (citing *State v. Hill*, 294 N.C. 320, 240 S.E.2d 794 (1978); *State v. Thomas*, 291 N.C. 687, 231 S.E.2d 585 (1977)). Given that the prosecutor notified defendant of the evidence four days before trial and knew of it himself no sooner, the trial court's ordering a recess to permit defendant to locate material on the subject or another expert witness was well within the due exercise of the discretion permitted the court under the circumstances. This assignment of error is overruled.

## II.

[8] Defendant next assigns as error the trial court's admission of SBI Special Agent Deaver's testimony concerning a microscopic quantity

of blood on the top leather portion of defendant's left boot. Other than revealing the presence of this "invisible" blood, Agent Deaver could draw no further conclusions as to the type or source of the minute quantity of blood he found. The invisible bloodstain could not be tested further to establish if it was human blood.

Defendant objected to the testimony and contends the results of the blood test were too attenuated and therefore not relevant. Alternatively, defendant contends that even if marginally relevant, the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. We do not agree.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402; *State v. Collins*, 335 N.C. 729, 734, 440 S.E.2d 559, 562 (1994). This Court has "interpreted Rule 401 broadly and [has] explained on a number of occasions that in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *Collins*, 335 N.C. at 735, 440 S.E.2d at 562 (citing *State v. Stager*, 329 N.C. 278, 302, 406 S.E.2d 876, 890 (1991)). "An individual piece of evidence need not conclusively establish a fact to be of some probative value. It need only support a logical inference of the fact's existence." *State v. Payne*, 328 N.C. 377, 401, 402 S.E.2d 582, 596 (1991).

Prior to the testimony of Agent Deaver, the State offered evidence tending to show defendant was one of the men at the trailer park where Mr. and Mrs. Batten were murdered. Defendant was the only one of the perpetrators acquainted with the Battens, and he was found with Mr. Batten's wallet in his possession shortly after the murders. Defendant also possessed a knife identical to the one found at the crime scene and later determined to be capable of causing the stab wounds on both victims. Defendant had boasted of the events which occurred on 29 February 1992 to a jailmate and former acquaintance, admitting participation in the murders of the Battens, and admitted on the witness stand that he was present when the murders occurred.

When considered with other circumstances shown by the evidence, evidence of an "invisible" bloodstain on the boot worn by defendant the night of the murders is probative of a material fact in this case and, therefore, relevant to the issue of whether defendant

actually participated in the crimes. "Once properly admitted, the weight to be given the evidence was a decision for the jury." *Whiteside*, 325 N.C. at 398, 383 S.E.2d at 916. The fact that the State could not show the source or type of the blood went to the weight of the evidence and not to its admissibility.

Defendant also contends that the evidence should have been excluded under the balancing test of Rule 403, as the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (1992). "The decision whether to admit evidence subsequent to a Rule 403 analysis rests within the sound discretion of the trial court, and its ruling will not be overturned unless it is shown that the ruling was 'manifestly unsupported by reason and could not have been the result of a reasoned decision.' " *State v. Mason*, 337 N.C. 165, 171, 446 S.E.2d 58, 61 (1994) (quoting *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986)). The testimony concerning the "invisible" bloodstain "was not presented in a manner designed to inflame the passions of the jury or otherwise to have 'an undue tendency to suggest decision on an improper basis.' " *Id.* (quoting *State v. Mercer*, 317 N.C. 87, 94, 343 S.E.2d 885, 889 (1986)). Defendant has shown no abuse of discretion on the part of the trial court; accordingly, this assignment of error is overruled.

### III.

[9] Defendant also assigns as error the trial court's admission of a family photograph of the victims, Leon and Margaret Batten, taken prior to the murders. The photograph was introduced during the testimony of the Battens' nephew, Douglas Batten, wherein he recounted his actions in response to the events occurring at the Dallas Mobile Home Park on 29 February 1992. His testimony was concluded as follows:

Q. . . . [A]t this time, I'm going to hand you a photograph which has been marked for purpose of identification as State's Exhibit Number 9, and I'll ask if you can identify that for us.

A. Yes, sir.

Q. And what is depicted in that photograph?

A. It's a photograph of my Uncle [Leon] and Aunt Margaret.

Q. And does that photograph, Exhibit Number 9, fairly and accurately depict the appearance of your aunt and uncle the last time you saw them alive prior to February 29, 1992?

STATE v. GOODE

[341 N.C. 513 (1995)]

A. Yes, sir.

Defendant contends that the photograph is irrelevant and should have been excluded under N.C.G.S. § 8C-1, Rule 403, as it "had the obvious and unavoidable effect of stirring the natural rage of the jurors at the senseless deaths of two elderly and apparently defenseless members of the community." We disagree.

" 'Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Holden*, 321 N.C. 125, 140, 362 S.E.2d 513, 524 (1987) (quoting *State v. Watson*, 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984)), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). The trial court must use a totality of the circumstances approach when determining admissibility of a photograph. The trial court should consider "[w]hat a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, [and] the scope and clarity of the testimony it accompanies." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

In the present case, the photograph was in fact used for illustrative purposes during Douglas Batten's testimony to describe his aunt and uncle while alive. We are not persuaded by defendant's argument that one photograph of the victims while they were alive so prejudiced defendant that he is entitled to a new trial. In fact, this Court rarely has found photographic evidence depicting the victim, even after death, to be so highly prejudicial as to require a reversal. *State v. Butler*, 331 N.C. 227, 235, 415 S.E.2d 719, 723 (1992) (quoting *State v. Robinson*, 327 N.C. 346, 357, 395 S.E.2d 402, 409 (1990)); *accord State v. Conaway*, 339 N.C. 487, 453 S.E.2d 824 (admission of photographs depicting the partially decomposed bodies of the victims not prejudicial), *reconsideration denied*, 339 N.C. 740, 457 S.E.2d 304 (1995); *State v. Corbett*, 339 N.C. 313, 451 S.E.2d 252 (1994) (no error in admission of twenty gruesome photographs of the crime scene and the victim); *State v. Ruof*, 296 N.C. 623, 252 S.E.2d 720 (1979) (photographs depicting the victim's head properly admitted to illustrate the entry and exit of the bullet). In light of our prior holdings with regard to the admissibility and lack of prejudicial effect of photographic evidence of the victims of brutal crimes, the admission of one photograph depicting Mr. and Mrs. Batten when they were alive does not rise to the level of prejudice required for a reversal. In fact, we are not persuaded that this photograph had any prejudicial effect at all.

*See State v. Bell*, 338 N.C. 363, 450 S.E.2d 710 (1994) (admission of photograph of victim dressed in police uniform taken prior to the murder not prejudicial), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 861 (1995); *State v. McNeill*, 326 N.C. 712, 392 S.E.2d 78 (1990) (photograph of victim and his brother taken prior to victim's murder properly admitted and not unduly inflammatory); *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673 (admission of photograph of victim and defendant taken prior to the murder not prejudicial error), *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986); *State v. Watson*, 310 N.C. 384, 312 S.E.2d 448 (no error in admission of photograph of victim holding a fishing pole taken prior to murders).

In the present case, due to the abundant evidence of brutality presented, it is natural the jurors would feel a sense of rage throughout the trial. However, this cannot be attributed to the admission of one photograph of the victims while they were living; rather, it is due to the cumulative effect of the evidence of the murders presented at trial. Based on our review of this evidence, we conclude that the trial court did not commit error by admitting this photograph into evidence. Defendant's assignment of error is overruled.

## IV.

[10] Next, defendant contends that the trial court erred by allowing testimony concerning defendant's participation in the robbery of Leonard Wiggins, which occurred prior to the murders. We disagree.

At trial, Glen Troublefield and Leonard Wiggins testified that on 29 February 1992, approximately one hour before the robbery and murders of Leon and Margaret Batten, defendant robbed Leonard Wiggins. Wiggins testified that as he was walking down Kay Drive, defendant and DeCastro got out of their car and approached him. Specifically, Wiggins testified that he was punched in the eye by defendant; his chain "snatched" off his neck; and his jacket pulled down around his elbows, rendering him helpless.

On appeal, defendant contends that this "other crime" evidence was inadmissible under N.C.G.S. § 8C-1, Rule 404(b). We disagree.

Rule 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1993). Such evidence is relevant and admissible under Rule 404(b) against a defendant "if the incidents are

STATE v. GOODE

[341 N.C. 513 (1995)]

sufficiently similar and not too remote in time so as to be more probative than prejudicial under the Rule 403 balancing test." *State v. Scott*, 318 N.C. 237, 248, 347 S.E.2d 414, 420 (1986).

The other crime may be offered on the issue of defendant's identity as the perpetrator when the *modus operandi* of that crime and the crime for which defendant is being tried are similar enough to make it likely that the same person committed both crimes. *State v. Moore*, 309 N.C. 102, 305 S.E.2d 542 (1983). This theory of admissibility requires "some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes." *Id.* at 106, 305 S.E.2d at 545.

*State v. Carter*, 338 N.C. 569, 588, 451 S.E.2d 157, 167 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 263 (1995). However, "[i]t is not necessary that the modus operandi of the crime the [S]tate seeks to have admitted rise to the level of the unique and bizarre." *State v. Green*, 321 N.C. 594, 604, 365 S.E.2d 587, 593, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988).

In the present case, the trial court conducted a *voir dire* on the admissibility of the "other crime" evidence. During this *voir dire*, Detective Kenneth Eatman of the Johnston County Sheriff's Department testified regarding the appearance of Leon Batten at the murder scene as follows:

> On the male victim, Mr. Batten, he was wearing a shirt and at the time I observed the body the shirt was off of him as you normally wear a shirt. It was fully entwined around his—both hands. His arms were sort of out in front of him, and the shirt was down around his hands.
>
> . . . .
>
> . . . The shirt completely was covering up his hands. [His hands] could not be seen. It was around—from the wrist area down was covered up by the shirt.

Detective Eatman also testified regarding the appearance of Margaret Batten at the murder scene as follows:

> The clothing on the female victim was in disarray. . . . Her coat and top clothing was down around the hand and arm area, up off the body.

. . . .

The hands were also covered up with clothing.

Further, evidence presented by the State tended to show that defendant stole Leon Batten's wallet sometime during or after his murder.

Thus, in both the robbery of Wiggins and the crimes committed against the Battens, there were at least two individuals involved who incapacitated the victims by pulling their clothing down around their elbows and hands, and at least one person was robbed during both events. Further, the evidence tended to show that defendant punched Wiggins in the eye during the robbery and that Leon Batten's body was found to have "areas of abrasion and bruising on his face." Based on our review of this evidence, we conclude that the similar acts and the close proximity of time in both the robbery of Wiggins and the crimes committed against the Battens tend to indicate that the same person was involved in both crimes. Thus, evidence of defendant's participation in the robbery of Wiggins was admissible to show identity under Rule 404(b).

Defendant also argues, however, that even if the evidence of defendant's involvement in the robbery of Wiggins were admissible under Rule 404(b), this evidence should still have been excluded under the balancing test of Rule 403.

As this Court recently stated in *Carter*:

We are well aware of the propensity for unfair prejudice to a defendant when evidence is introduced that he has committed a crime separate and distinct from the crime or crimes for which he is being tried. However, the facts of each case will ultimately determine whether evidence of a defendant's former crime is pertinent in his prosecution for another independent crime. *State v. Shane*, 304 N.C. 643, 654, 285 S.E.2d 813, 820 (1982).

338 N.C. at 589, 451 S.E.2d at 168 (citation omitted).

In this case, the similarities between the robbery of Wiggins and the crimes committed against the Battens are sufficiently probative of identity, and we are satisfied that the probative value of the evidence of defendant's involvement in the prior robbery outweighs any potential for unfair prejudice against defendant. Defendant's assignment of error is overruled.

## V.

**[11]** Defendant next contends that the trial court erred by allowing the prosecutor to cross-examine defendant about a letter he wrote to his wife four days prior to the murders. Defendant argues that the letter was irrelevant and highly prejudicial. We disagree.

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611 (1992). Having previously set out the tests for relevancy, we conclude that the statements contained in the letter to defendant's wife were relevant to show defendant's state of mind and possible motive in killing Leon Batten. The letter contained defendant's statements regarding his thoughts and feelings four days prior to the murders, including defendant's anger over discovering that his wife had allegedly been cheating on him. Specifically, defendant stated in the letter: ·

> As you might already know, some people have told me that you cheated on me while I was away. At first I was ready to just kill someone, anyone. But as the days went by I had the chance to think, and all I want to know is if what they said was it [sic] true. Through all this hurt that I have felt for some strange reason I still love you and want you. Think about what vows you and I made and then be truthful with yourself and then with me.

As previously noted, Patrick Byrd testified for the State that defendant told him that he and his three friends were at his trailer drinking when Leon Batten arrived. Upon his arrival, defendant had mentioned the fact that Mr. Batten had been "messing around" with his wife. According to Byrd's testimony, DeCastro hit Mr. Batten, and then defendant began to stab him.

In light of Patrick Byrd's testimony that immediately prior to stabbing Leon Batten, defendant speculated that Batten had been "messing around" with his wife, we conclude that defendant's statements in the letter regarding his anger and desire to kill someone as a result of his wife cheating on him, written four days prior to the murder, were relevant to show a motive for defendant's killing Mr. Batten. *See Corbett*, 339 N.C. 313, 451 S.E.2d 252 (holding that cross-examination of defendant concerning the fact he lied to his wife about being the father of the victim's child was admissible to show defendant had a motive to lie and possibly to murder). The relevance of this evidence is also apparent in the jury's finding of the mitigating circumstance

that defendant was under the influence of mental or emotional disturbance with regard to the murder of Leon Batten but not with regard to the murder of Margaret Batten.

Further, we conclude that the trial court did not abuse its discretion under Rule 403 by allowing the cross-examination of defendant concerning this letter. Defendant's assignment of error is without merit.

## VI.

[12] Next, defendant contends that the trial court erred by allowing the prosecutor to cross-examine defendant concerning a prior false statement. Defendant argues the cross-examination went beyond the permissible scope of Rule 608(b). We disagree.

Rule 608(b) provides that specific instances of conduct of a witness may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning his character for truthfulness or untruthfulness." N.C.G.S. § 8C-1, Rule 608(b) (1992). This Court has established the following four prerequisites for admitting evidence of specific instances of conduct under Rule 608(b):

> (1) the *purpose* of producing the evidence is to impeach or enhance credibility by proving that the witness' conduct indicates his character for truthfulness or untruthfulness; and (2) the conduct in question *is in fact probative* of truthfulness or untruthfulness and is not too remote in time; and (3) the conduct in question did *not result in conviction*; and (4) the inquiry into the conduct *takes place during cross-examination.*

*State v. Morgan*, 315 N.C. 626, 634, 340 S.E.2d 84, 89-90 (1986). "Because the only purpose for which this evidence is sought to be admitted is to impeach or to bolster the credibility of a witness, the only character trait relevant to the issue of credibility is veracity or the lack of it." *Id.* at 634, 340 S.E.2d at 90.

In the present case, after arguments of counsel regarding the prior false statement relating to an incident of assault involving defendant, the trial judge excluded the evidence of the assault while allowing questions concerning statements defendant made to hospital personnel and a commanding officer. The pertinent exchange was as follows:

**STATE v. GOODE**

[341 N.C. 513 (1995)]

Q. Well, Mr. Goode, I want to turn your attention to the early part of March of 1991. Is it not true that you were in the Marine Corps at that time?

A. Yes, Sir.

Q. And is it not true that prior to being questioned by the Naval Investigator that you had lied to hospital personnel and to the commanding officer about what had occurred?

[DEFENSE COUNSEL]: Objection.

A. Yes, Sir.

THE COURT: Overruled.

Q. And is it not true that prior to being questioned by the Naval Investigator that you had lied to hospital personnel and to the commanding officer about what had occurred?

[DEFENSE COUNSEL]: Objection.

A. Yes, Sir.

Q. And you admit that you lied, is that correct?

A. Yes, Sir.

Q. That's all. Thank you.

It is clear that defendant's false statements to the hospital personnel and commanding officer are indicative of defendant's truthfulness or untruthfulness. Also, the statements occurred less than a year before the crimes were committed in the present case. Further, these statements did not result in a conviction. Therefore, we conclude the cross-examination met the four prongs of the *Morgan* test and was properly admitted.

Furthermore, we disagree with defendant's contention that his testimony should have been excluded as more prejudicial than probative under the balancing test of Rule 403 of the North Carolina Rules of Evidence. The fact that defendant took the stand to testify in his own defense put his credibility at issue, and evidence that defendant previously lied to his commanding officer and hospital personnel is highly probative of defendant's character for truthfulness. We also note that the trial court excluded any reference to the assault that preceded defendant's false statements. Accordingly, defendant's assignment of error is overruled.

## VII.

[13] Defendant next contends that the trial court erred by failing to intervene *ex mero motu* and instruct the jury to disregard a statement made by the prosecutor during closing arguments in the guilt-innocence phase of the trial. Defendant claims the statement was both legally inaccurate and highly prejudicial. We do not agree.

The arguments of counsel are left largely to the control and discretion of the trial judge, and counsel will be granted wide latitude in the argument of hotly contested cases. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). "Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom." *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). "Because defendant did not object to the portions of the argument to which he now assigns error, 'review is limited to an examination of whether the argument was so grossly improper that the trial [court] abused [its] discretion in failing to intervene *ex mero motu*.' " *State v. McNeil*, 324 N.C. 33, 48, 375 S.E.2d 909, 924 (1989) (quoting *Gladden*, 315 N.C. at 422, 340 S.E.2d at 685), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991).

At trial, the State presented an acting in concert theory as one basis for defendant's guilt. Further, during his closing argument, the prosecutor made the statement, "he who runs with the pack is responsible for the kill." Defendant contends that this statement combined with the prosecutor's comments on the law of acting in concert prejudiced his ability to have a fair trial. We disagree.

In *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983), we held that a prosecutor's argument to the jury during a capital murder case in which the prosecutor used an analogy comparing the defendants to "a pack of wolves" was not grossly improper. In *Craig*, the prosecutor used the analogy to illustrate how concert of action led to each of the defendants' responsibility for the murder. This Court held that the analogy was supported by the evidence and was phrased in a manner which was not inflammatory. *Id.* at 458, 302 S.E.2d at 747. Similarly, in this case, the prosecutor used the phrase "he who runs with the pack is responsible for the kill" to illustrate acting in concert. There was ample evidence to support this inference, and we find the trial court did not err by fail-

STATE v. GOODE

[341 N.C. 513 (1995)]

ing to intervene *ex mero motu* during the prosecutor's closing argument. This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

## VIII.

[14] In the sentencing proceeding of the trial, defendant contends that the trial court erred by excluding evidence of a codefendant's criminal record as a nonstatutory mitigating circumstance. Defendant argues the fact that his accomplice had an extensive prior criminal record for violent crimes makes it likely that defendant's participation in the murders was less than that of his accomplice. Defendant also contends that the trial judge improperly relied on the authority of *State v. Williams* in reaching its decision. *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983). We disagree.

The trial court is required to submit a requested nonstatutory mitigating circumstance if a jury could reasonably find it to have mitigating value and there is substantial evidence to support a reasonable finding by the jury that the circumstance exists. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). This Court has defined a mitigating circumstance as

> a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, but which may be considered as extenuating, or reducing the moral culpability of the killing, or making it less deserving of the extreme punishment than other first-degree murders.

*State v. Irwin*, 304 N.C. 93, 104, 282 S.E.2d 439, 446-47 (1981) (citing *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981)). Mitigating circumstances, statutory and nonstatutory alike, focus on positive aspects of a defendant's character or behavior. *State v. Miller*, 339 N.C. 663, 455 S.E.2d 137 (1995).

Defendant suggests that the jury could infer that because his accomplice has a prior criminal record, he himself was less likely to commit the crime. However, his accomplice's criminal record has no bearing on defendant's character or propensity to commit the crime. The "circumstances of the offense and the defendant's age, character, education, environment, habits, mentality, propensities and criminal

record" generally are relevant to the issue of mitigation. *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995). Furthermore, the statutory mitigating circumstance that "the murder was actually committed by another person and the defendant was only an accomplice in or accessory to the murder and his participation was relatively minor," *see* N.C.G.S. § 15A-2000(f)(4) (Supp. 1994), was submitted to the jury but not found to exist. Because the accomplice's prior criminal record does not meet the definition of a mitigating circumstance, we conclude it is irrelevant to the determination of the issue of mitigation here.

Defendant also contends that the trial court improperly relied on the authority of *Williams*, 305 N.C. 656, 292 S.E.2d 243, wherein this Court held that the punishment of a defendant's accomplice is not a mitigating circumstance which must be submitted to the jury. Defendant argues that *Williams* was overruled by the United States Supreme Court in *Parker v. Dugger*, 498 U.S. 308, 112 L. Ed. 2d 812, *reh'g denied*, 499 U.S. 932, 113 L. Ed. 2d 271 (1991), which allows "differential sentences" between accomplices to be considered as a mitigating circumstance. Defendant concedes that neither of these cases addresses the specific issue presented in this case. Therefore, as the above-mentioned cases are not controlling here, it is immaterial that the trial court cited to *Williams* in making its determination. Because we have already determined the requested nonstatutory circumstance does not mitigate or make defendant less culpable for the murders, we conclude that the trial court did not err in excluding it. Defendant's assignment of error is overruled.

## IX.

[15] Defendant next assigns as error the trial court's refusal to admit the nonstatutory mitigating circumstance "lingering doubt" of guilt for the jury's consideration. We disagree.

In order for defendant to succeed on this assignment, he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Upon such showing by the defendant, the failure by the trial judge to submit such

nonstatutory mitigating circumstance to the jury for its determination raises federal constitutional issues.

*State v. Hill,* 331 N.C. 387, 414, 417 S.E.2d 765, 778 (1992) (citing *Benson,* 323 N.C. at 325, 372 S.E.2d at 521), *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied,* —— U.S. ——, 123 L. Ed. 2d 503 (1993).

The United States Supreme Court has held that trial courts are not required to submit lingering doubt of guilt as a mitigating circumstance. *Franklin v. Lynaugh,* 487 U.S. 164, 101 L. Ed. 2d 155 (submission of doubt of guilt as mitigator not constitutionally required), *reh'g denied,* 487 U.S. 1263, 101 L. Ed. 2d 976 (1988). In *Franklin,* the United States Supreme Court held that lingering doubt as to the defendant's guilt does not involve the defendant's character or record, or the circumstances of the offense. *Id.* at 174, 101 L. Ed. 2d at 166. This Court adopted the precedent announced in *Franklin* in its decision in *Hill,* 331 N.C. 387, 417 S.E.2d 765, and it was properly applied in the present case.

Defendant argues that reliance on *Hill* is misplaced, as it is inconsistent with other decisions of this Court. Both cases defendant cites as being inconsistent with exclusion of "lingering doubt" as a mitigating circumstance, however, were decided prior to *Hill. See State v. Bray,* 321 N.C. 663, 365 S.E.2d 571 (1988); *State v. Payne,* 312 N.C. 647, 325 S.E.2d 205 (1985). Accordingly, we find no error.

## X.

[16] Defendant also assigns as error the trial court's failure to intervene *ex mero motu* and instruct the jury to disregard the prosecutor's inflammatory argument at the close of the sentencing phase. Defendant contends that the prosecutor's characterization of the events occurring the night of the murders as a "feeding frenzy" was highly prejudicial and only offered to inflame the passions of the jury. We do not agree.

Although no objection was raised by defendant, "[a]n appellate court may review the prosecution's arguments, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Kirkley,* 308 N.C. 196, 210, 302 S.E.2d 144, 152 (1983), *overruled on other grounds by State v. Shank,* 322 N.C. 243, 367 S.E.2d 639 (1988), *and by State v. Rouse,* 339 N.C.

59, 451 S.E.2d 543 (1994). To establish an abuse of discretion, defendant must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993) (citing *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157, *reh'g denied*, 478 U.S. 1036, 92 L. Ed. 2d 774 (1986)), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994). "It is well settled that the arguments of counsel are left largely to the control and discretion of the trial judge and that counsel will be granted wide latitude in the argument of hotly contested cases." *Williams*, 317 N.C. at 481, 346 S.E.2d at 410. "Counsel is permitted to argue the facts which have been presented as well as reasonable inferences which can be drawn therefrom." *Id.*

The relevant portion of the prosecutor's closing argument following the sentencing phase proceeded as follows:

Thank God, none of the family members happened upon the scene of this feeding frenzy until law enforcement arrived. You see, there's simply no way to anticipate or prepare for what [Mrs. Batten] went there to find. She arrived at the scene of her husband's brutal murder, to find defendant with the others. Yet, with the thirst not yet satisfied with the slaying of Mr. Batten. And sensing that Mrs. Batten was unarmed, unlike Detective Bass, the law enforcement officer, and that she would therefore be easy prey, she was pounced upon and you've seen [the] resulting carnage.

"In reviewing the remarks at issue in this case, we consider the context in which the remarks were made and the overall factual circumstances to which they referred." *State v. Daniels*, 337 N.C. 243, 277, 446 S.E.2d 298, 319 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). In *Craig*, 308 N.C. 446, 302 S.E.2d 740, this Court allowed the prosecutor to refer to the defendants' acts as those of a "wolfpack" to illustrate the especially heinous, atrocious, or cruel nature of the crime. In the present case, the prosecutor similarly uses the words "feeding frenzy" to emphasize the brutality and senselessness of the murders of an elderly and defenseless couple. This analogy was supported by the evidence that the victims were unsuspecting of the attack, unarmed, and stabbed repeatedly and that the victims' clothing was ripped and in disarray, with the only apparent gain of the defendant and his accomplices being a wallet and its contents. This assignment of error is overruled.

**STATE v. GOODE**

[341 N.C. 513 (1995)]

PROPORTIONALITY REVIEW

## XI.

**[17]** Having found no error in either the guilt or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of two counts of first-degree murder upon the theory of premeditation and deliberation. In one of the murders, defendant was also convicted on the theory of felony murder. In both of these murders, the jury found the aggravating circumstances that the murders were especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the murders were part of a course of conduct which included the commission by the defendant of other crimes of violence, N.C.G.S. § 15A-2000(e)(11). In the murder involving a felony, the jury also found the aggravating circumstance that the murder was committed by the defendant while in the commission of robbery with a dangerous weapon. N.C.G.S. § 15A-2000(e)(5). We conclude that the evidence supports each aggravating circumstance found. We further conclude, based on our thorough review of the record, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. at 164-65, 362 S.E.2d at 537. Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). We compare this case to others in the pool, which are defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant," *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267

(1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

This case is distinguishable from the cases in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. First, the defendant was convicted of the murders of two individuals. "We have remarked before, and it bears repeating, that this Court has never found disproportionality in a case in which the defendant was found guilty for the death of more than one victim." *State v. Price*, 326 N.C. 56, 95, 388 S.E.2d 84, 107, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds*, —— U.S. ——, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, —— U.S. ——, 129 L. Ed. 2d 888, *on remand*, 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied*, —— U.S. ——, 131 L. Ed. 2d 879 (1995). Further, the jury convicted the defendant on the theory of malice, premeditation, and deliberation in both of the murders, and also the felony murder rule in one of the murders. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Finally, the elderly victims would have been no match for the physical strength of defendant, a healthy twenty-two year-old man, and his accomplices.

We recognize that juries have imposed sentences of life imprisonment in several cases which are similar to the present case. However, "the fact that one or more cases is factually similar to the one under review, in which juries have recommended life imprisonment, is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47 (1994). Our review of such cases reveals that they are distinguishable and do not render the sentence of death in this case disproportionate. None of those cases involved a defendant who committed double murders with regard to which the jury found the same aggravating circumstances to exist. It suffices here to say that we have examined all of the cases cited by defendant and conclude that each of them is distinguishable from the present case.

Further, this case is similar to cases in which we have found the death penalty proportionate. We have upheld a sentence of death where, as in this case, the jury found the aggravating circumstances involved in the present case. Here, it suffices to say that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have *consistently* returned recommendations of life imprisonment. *E.g.*, *State v. Ingle*, 340 N.C. 108, 455 S.E.2d 664 (1995) (double murder as to which the jury found the aggravating circumstances that the murder was especially heinous, atrocious, or cruel and that the murder was part of a course of conduct involving other violent crimes—death sentence proportionate); *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994) (double robbery-murder as to which the jury found the aggravating circumstances that the murder was part of a course of conduct including other violent crimes; that the murder was especially heinous, atrocious, or cruel; that the murder was committed while the defendant was engaged in homicide, rape, robbery, etc.; and that defendant was previously convicted of a violent felony— death sentence proportionate), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 738 (1995).

Based on the nature of this crime, and particularly the features noted above, we cannot conclude as a matter of law that the sentence of death was disproportionate. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.