## Hofmann Estate

576

*William P. Fox, Paul J. Donnelly* and *Francis X. Quinn*, for accountant.

*Guy Claire, Eric O. Angermann* and *Henry R. Craig*, for Susanna Hofmann, claimant.

*Desmond J. McTighe*, for administratrix of estate of Anna Hofmann.

*Robert Honeyman, Elmer C. Pfeiffer* and *Arno P. Mowitz*, for other claimants.

VAN RODEN, P. J., thirty-second judicial district, specially presiding, June 11, 1948.—Decedent, a widow, died December 23, 1939, intestate and without issue. Letters of administration on her estate were duly granted unto her surviving sister, Clara Bacher. All the rest of decedent's next of kin and heirs at law are aliens, being residents of Germany.

At the time said letters of administration were issued, Mrs. Bacher was about 65 years of age. She was a housewife, and had little or no business experience. She was unable to read English or to speak it fluently, having lived in Germany until she emigrated to this country in 1910.

The said administratrix retained William J. Ballen, then a member of the Philadelphia bar in good standing and with a good reputation for honesty and integrity, to act as her attorney in connection with the administration of this estate. On January 31, 1940, she executed a power of attorney in favor of Ballen, authorizing him "to collect any and all moneys due the estate, and to endorse any and all checks payable to me as administratrix of the said estate, and to deposit the funds so collected in his attorney's account".

The assets of the estate included a claim against one Neta Nebel in the sum of $4,500 with interest from

November 18, 1939. On February 7, 1940, this debtor delivered unto Ballen her judgment note in the sum of $4,500 payable to the order of Clara Bacher, administratrix of the estate of Anna Hofmann, deceased. On February 12, 1940, the debtor made a payment on account thereof in the sum of $2,250 by check payable to the order of William J. Ballen, attorney, which he endorsed and cashed, and on March 30, 1940, she made another payment of $2,111.25 by check payable to the order of William J. Ballen, attorney, which he endorsed and deposited in his personal bank account.

On February 10, 1940, the Western Saving Fund Society issued its check to the order of the administratrix in the sum of $1,317.16 in payment of certain accounts of decedent. The administratrix endorsed this check to the order of Wm. J. Ballen, attorney, and he then endorsed it and deposited it in his personal bank account.

The Front and Huntingdon Building and Loan Association, which was indebted to decedent, issued two checks, one for $1,521, dated February 20, 1940, and the other for $1,530 dated April 15, 1940, both payable to the order of the estate of Anna Hofmann. Ballen, without the knowledge of the administratrix, endorsed both checks "Estate of Anna Hofmann, William J. Ballen, Attorney", and deposited them in his personal bank account.

On April 20, 1940, the administratrix executed an assignment of a $2,000 mortgage (secured on premises 618 West Luray Street, Philadelphia) for a stated consideration of $1,200, which sum was paid to Ballen. (It also appears that the owner refinanced the property on July 15, 1940, for $1,800 and that a check for $1,840 was paid out of the settlement proceeds to the mortgage assignee, but there is no evidence as to whether or not Ballen received any portion of the additional $640.)

Other assets of the estate, totaling $1,087.59, were collected and deposited in an account opened in the name of Clara Bacher, administratrix of estate of Anna Hofmann.

On November 13, 1940, Ballen died, leaving no assets, and the administratrix then learned for the first time that he had appropriated to his own use the above-described funds of the estate which came into his hands, resulting in a loss to the estate of $9,929.41.

The administratrix commenced suit against the City National Bank seeking to recover on certain of the checks improperly cashed by Ballen or deposited in his personal account, but recovery against the bank was denied by the court on the ground that defendant was not bound to inquire whether the transaction constituted a breach of fiduciary obligation in the absence of bad faith on the part of the bank. See Bacher, Admrx., v. City National Bank, 347 Pa. 80 (1943) and Strong v. City National Bank of Philadelphia, 355 Pa. 390 (1947).

The said administratrix died March 25, 1944, and letters testamentary on her estate were granted unto the executor named in her will, who has since died, and his executor has stated the account now before the court.

Exceptions have been filed to the said account challenging, inter alia, a credit claimed in the sum of $9,887.62 for "embezzlement of funds of the estate by William J. Ballen, Esq." and exceptants have urged the court to disallow the said credit and order a corresponding surcharge against the estate of the deceased administratrix and against the surety on her bond.

The general principle of law covering the liability of a fiduciary for the embezzlment of his attorney is stated in Hunter's Pennsylvania Orphans' Court Commonplace Book, vol. 1, p. 76, §10, as follows:

"There is no liability for moneys entrusted to an attorney and converted by him, where he had thereto-

fore sustained a good reputation for honesty and integrity, and where no negligence on the part of the fiduciary is established."

The administratrix was not an insurer of the estate funds against the possibility of loss, and all that was required of her was good faith and reasonable diligence: Darlington's Estate, 245 Pa. 212 (1914). She cannot be held liable for the misconduct of her attorney, unless her own conduct was such as to amount to gross negligence: Webb's Estate, 165 Pa. 330 (1895). It is, therefore, necessary to scrutinize all the actions of this administratrix which might possibly come within the category of supine negligence, as charged by exceptants.

There is no evidence of lack of due care on the part of the administratrix in the selection of William J. Ballen as her attorney, since it is conceded that he had previously enjoyed a good reputation for both ability and integrity. Having retained him, she was justified in following his advice and instructions. As stated in Hemphill's Estate No. 2, 19 Dist. R. 606 (1910):

"The reposing of confidence in an attorney in good standing, sworn to act with due fidelity both to his client and to the court, has never to our knowledge been held to be negligence and certainly no case has been called to our attention where an accountant has been surcharged as a result of so acting."

When the attorney requested the administratrix to sign a formal power of attorney, it was only natural for her to assume that such action was necessary and proper. The collection of the assets of this estate presented problems of considerable complexity for an elderly woman who possessed no business experience and was further handicapped by her poor knowledge of the English language. The very reason for employing an attorney was to obtain the benefit of his professional skill and knowledge, and it would be mani-

festly unjust to penalize a client for the misconduct of the attorney where she merely followed his advice in good faith and without reason to suspect his integrity. With regard to the particular transactions handled by Ballen with resulting loss to this estate, it may be noted that they fall into three separate factual categories.

The first is composed of two checks of the Huntingdon Building and Loan Association which were payable to the order of the estate and which were endorsed by Ballen and then converted to his own use. There is no evidence that the administratrix ever had possession of these checks or any knowledge concerning Ballen's actions with respect thereto. This is clearly a case of embezzlement by the attorney of funds intended for the administratrix but which never actually reached her hands. In such case, the courts have consistently refused to surcharge the fiduciary: Landmesser's Appeal, 126 Pa. 115 (1889) ; Bender's Estate, 278 Pa. 199 (1923).

The second class of transactions consists of the checks received by Ballen in the collection of the Nebel judgment and the mortgage on the Luray Street property. These checks were payable to William J. Ballen, attorney, and were either cashed by him or deposited in his personal account, contrary to the provisions of the power of attorney authorizing deposit only in his attorney account. There is no evidence that the administratrix knew or should have known of his violation of instructions. It was surely not her duty to accompany him to the bank to insure deposit of each check to the proper account. She had a right to repose confidence in the reputation of honesty and integrity of her counsel and in the absence of any occurrences calculated to awaken suspicion as to his skill or diligence, she should not be held liable for money lost in consequence of his insolvency: Calhoun's Estate, 6 Watts 185 (1837).

The third category comprises the check of the Western Saving Fund Society, which was payable to the order of the administratrix and endorsed by her to the order of the attorney and turned over to him for deposit. Instead of depositing it in the estate account or in his attorney account, he deposited it in his personal account and converted the proceeds to his own use. This differs from the previously discussed situations in that here the administratrix actually had possession of the asset for a brief moment before she voluntarily turned it over to the attorney. This feature of the case closely resembles Schilskey's Estate, 12 Dist. R. 181 (1903), where the administratrix and the attorney together visited the saving fund to withdraw money belonging to decedent. She gave a receipt for the money and it was paid by the officer of the saving fund to her attorney with her consent, to be deposited by him in the trust company which had become her surety, where she had opened an estate account under an agreement that all moneys belonging to the estate should be deposited therein. Instead of depositing the check in the estate account, the attorney misappropriated it to his own account. The court refused to surcharge the administratrix, stating as follows (p. 182) :

"It would be most unusual for an administrator, especially a woman in humble life and ignorant of the mode of conducting the business connected with the settlement of an estate, as this accountant seemed to be, to suspect a trusted attorney, and examine whether he had deposited money received by him immediately upon its receipt in the estate's bank account. Full reliance was placed by her upon her attorney; and it certainly was not supine negligence equivalent to fraud, nor willful default, in the administratrix reposing the confidence she did in her professional adviser, to refrain from an examination of her bank account or demand from him her deposit and check book or vouchers in his possession. She was herself

honest, and readily and naturally believed her attorney equally honest and faithful to her interest. She could not foresee his want of integrity and unfaithfulness so as to take from him the management and settlement of the estate, after she had entrusted it to him, and he was not the subject of doubt or suspicion until it was too late."

Similarly, in O'Reilly's Estate, 11 D. & C. 549 (1929), where the administratrix, a sister in religion, engaged a reputable attorney at law to collect moneys due the estate, and the checks for same payable to her order were endorsed by her and delivered to the attorney for deposit in her account, but instead of so doing he misappropriated the proceeds, a request for surcharge against the administratrix was refused.

In Darlington's Estate, supra, the trustee gave her attorney at law, who was representing her in the management of the trust estate, a key to the safe deposit box in which the securities belonging to the estate were kept. He removed some of the securities and converted them to his own use. He also embezzled some money which she entrusted to him for investment. An order of the orphans' court surcharging her for the loss was reversed by the Supreme Court which held that she was not liable for the attorney's misconduct in the absence of a finding that the loss resulted from any improper action on her part.

Of course, if the administratrix had had any reason to suspect the attorney and then failed to take proper steps to collect the assets from him when it was possible to do so, she may properly be held liable for the loss. See Webb's Estate, supra, at page 338. But all the transactions here involved took place within a few months and the administratrix had no intimation whatsoever of the real situation until it was discovered after the attorney's death. Thereafter, she immediately took legal action against the bank which permitted him to deposit the estate checks in his personal account

and she prosecuted the litigation vigorously albeit unsuccessfully. She also promptly investigated the possibility of recovering against the attorney's estate but learned that he died without any assets whatsoever. It must be concluded, therefore, that the administratrix acted with "common skill, common prudence and common caution", which was all that the law required of her. See Calhoun's Estate, supra, at pages 189-90.

Accordingly, the court refuses to enter a surcharge against her estate. It necessarily follows that the surety is likewise relieved from responsibility. The exceptions relating to the credit claimed in the account for funds misappropriated by the attorney are hereby dismissed. . . .

The remaining claim to be considered is that of Susanna Hofmann, a niece of decedent's husband, who claims the entire estate by virtue of an alleged contract whereby she would become decedent's sole heir. Although there is no allegation that decedent expressly promised to make a will in her favor, it is obvious that claimant, who was not decedent's niece or next of kin, could inherit only by will and not under the intestate laws. It follows, therefore, that in order for this claim to be successful, a contract to make a will naming claimant as sole beneficiary must be established.

It appears from the evidence that in 1937 decedent and her husband, who were childless, desired to bring claimant, then residing in Germany, over to this country to reside with them in their home as a member of their family. In one of the letters which they wrote to her, they described the comforts and advantages of their home and stated that "this shall all become your property". In another letter, they wrote that they "offer to give you in every way a good home . . . you are coming to us in the status of a child . . . we are providing for you beyond the end of your life."

In order to induce the American consul in Berlin to grant a visa to claimant, decedent and her husband sent the consul a statement that they would "look after and support" claimant and that she "will be in our home exclusively and will be our sole heir in the event of our death". They also executed a customary affidavit of support in which they agreed that they would not permit the alien to become a public charge.

On November 25, 1937, Susanna reached this country, took up residence in the home of decedent and her husband and lived there for the remainder of their lives. Herman Hofmann died December 10, 1939, and Anna Hofmann died December 13, 1939. Both died intestate. At Herman's death, all the property vested in Anna as surviving tenant by the entirety.

During the period that claimant lived with her uncle and aunt, she did most of the housework and also assisted in caring for the uncle and aunt who were in poor health, both being of advanced age and, in addition, the uncle developed blindness and the aunt encountered mental disturbances.

They provided her with board, lodging, clothing and a little spending money. On several occasions, decedent and her husband stated to third persons that they "didn't need a will" as everything would belong to Susanna when they died.

An agreement to make a will or to devise property in a stipulated manner, if supported by consideration, is binding and irrevocable: Kocher Estate, 354 Pa. 81 (1946). But such agreement must be established by evidence which is clear, precise and indubitable, and mere proof of declarations of testamentary intentions made to third persons do not prove a contract between decedent and claimant to make a will in the latter's favor: Roberts Estate, 350 Pa. 467 (1944).

In Stichler Estate, 35 Del. Co. 55 (1947), affd. 359 Pa. 262 (1946), the evidence disclosed that when decedent's wife died, he sent for his daughter, claimant,

who then resided in New York City, to come to Philadelphia and take over the management of his house, which she did. She sought to establish that he orally agreed to will her his entire residuary estate. A disinterested witness testified that, in the presence of claimant and her husband, "Mr. Stichler said if they would come and live with him, take care of the house, everything will be yours, and everything will go to you." There was also evidence of statements made to third persons, not in the presence of claimant or her husband, to the effect that "all his earthly possessions would become the property of his daughter when he passed on". These were held to be but mere loose declarations of testamentary intentions, insufficient to establish an enforcible contract.

The oral declarations of decedent and her husband in the instant case were not as strong as those in the Stichler case. Accordingly, they cannot in themselves warrant the awarding of the estate to claimant.

Claimant's able counsel seek to bolster her claim by urging that she is a third party beneficiary of the written agreement made by decedent and her husband to the Federal authorities wherein they agreed to support her and keep her from becoming a public charge, and further stated that she would be their sole heir. With regard to these written declarations which were submitted to the Federal authorities in support of the application for a visa to enable claimant to enter this country, it is apparent that they constitute obligations to the United States rather than to claimant, who was at best only an incident beneficiary. As stated in A. L. I. Restatement of the Law of Contracts, vol. 1, §147:

"An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee."

And see Chapman's Estate, 87 Pa. Superior Ct. 333 (1926) ; cf. section 145 of A. L. I. Restatement of the Law of Contracts, supra, relating to beneficiaries un-

der promises to the United States, a State, or a municipality.

The court is informed that claimant is presently confined in a hospital on account of a serious disease and that she is in destitute circumstances. If she is reduced to the status of a public charge, there may be a right of action in an appropriate governmental agency to enforce decedent's undertaking to support her. However, no such claim has been here presented and therefore, the court cannot decide such question at this time. We merely hold that claimant acquired no rights by virtue of the written declarations made by decedent to the Federal authorities, and that the oral declarations made by decedent to claimant and third parties are insufficient to establish an enforcible contract to make a will in claimant's favor.

Furthermore, as was stated in the Stichler case, on a breach of contract to will the whole or part of an estate, the measure of the damages is the value of the services rendered and not of the estate promised to be willed. Accord: Cramer v. McKinney et al., 355 Pa. 202 (1946) ; Jones Estate, 359 Pa. 260 (1948). In the instant case, the evidence tending to establish the value of services is altogether too vague and unsatisfactory. In addition thereto, it must be remembered that decedent and her husband furnished claimant with board, lodging and spending money in return for such services.

While the mere relation of niece by marriage created no legal or moral duty on claimant to come to this country and devote her time to housekeeping and nursing services (Griffin Estate, 96 Pa. Superior Ct. 185 (1929)), nevertheless, where it is clear from the evidence as in this case, that the relationship was one of "in loco parentis", it is incumbent to establish an express contract which must be "clearly proved by direct and positive testimony and in terms definite and certain": Swieczkowski v. Sypniewski, 294 Pa. 323, 330.

It would also appear that other insurmountable bars to recovery by claimant in this case have been created by the statute of frauds and the statute of limitations. It has been held that the statute of frauds bars the enforcement of an oral contract to make a will covering property consisting of both personalty and real estate: Norris Estate, 329 Pa. 483 (1938) ; Byrne's Estate, 122 Pa. Superior Ct. 413 (1936).

Although we have been unable to find any reported decision determining the applicability of the statute of limitations to a contract to make a will, there is no reason in law or logic why it should not so apply. The damages for a contract to make a will being the value of the services rendered, and a claim for services rendered beyond the statutory period not being permitted, it would seem to follow that an oral contract to make a will cannot be enforced where more than six years have expired after the date of death.

Accordingly, the claim of Susanna Hofmann is hereby dismissed.