HARVEY C. TAYLOR, JR., PLAINTIFF v. DON A. ABERNETHY AND JACK C. WEIR, ADMINISTRATOR CTA OF THE ESTATE OF ROMER GRAY TAYLOR, DEFENDANTS

No. COA01-470

(Filed 19 March 2002)

### 1. Parties— intervention—following dismissal

The trial court did not abuse its discretion in an action for specific performance of a contract to make a will by allowing defendant Abernathy to intervene after being voluntarily dismissed as a party where there was support in the record for the trial court's findings that defendant had an interest in the property, defendant's interest was not being adequately represented by the administrator of the estate, defendant's motion was timely in that he moved to intervene as soon as he discovered he would no longer be a party to the case, and plaintiff had more than one opportunity to cure any prejudice by requesting a mistrial.

### 2. Discovery— request for admissions—late answer—admission allowed to be withdrawn

The trial court did not abuse its discretion in an action on a contract to make a will by allowing defendant Abernethy to withdraw an admission that the decedent had signed a contract to make a will where Abernethy denied the validity of the signature on the contract in a late answer to a request for admissions. Abernethy's late response was only a few days overdue and came

six months prior to trial, the merits of the action depended upon a determination of the signature's validity, and the court gave plaintiff the opportunity to request a mistrial in order to rectify any prejudice to plaintiff.

### 3. Evidence— handwriting—expert testimony

The trial court erred in an action on a contract to make a will by refusing to allow a handwriting expert to give his opinion on the validity of the decedent's purported signature on the contract where the court did not consider the methodology of handwriting analysis to be sufficiently scientific. North Carolina requires only that the expert be better qualified than the jury as to the subject at hand with the testimony being helpful to the jury, and there is no requirement that the party offering the testimony produce evidence that it is based in science or has been proven through scientific study. The pertinent question is whether the testimony is sufficiently reliable; here, the testimony met the four indicia of reliability set forth in *State v. Goode*, 341 N.C. 513. The exclusion was prejudicial because the testimony went to the ultimate fact in issue.

### 4. Statutes of Limitations and Repose— contract to make a will—runs from date of death

The trial court did not err in an action on a contract to make a will by denying defendant's motion to dismiss the complaint as time barred where the argument was based on the assertion that the statute of limitations began to run as soon as the contract was executed, but a cause of action for breach of an agreement to make a will begins to run at the death of the party under Pennsylvania law (applicable here) and, apparently, under North Carolina law.

Appeal by plaintiff from an order and judgment entered 27 September 2000 and from an order entered 9 February 2001 by Judge Raymond Warren in Burke County Superior Court. Heard in the Court of Appeals 22 January 2002.

*Wyatt Early Harris Wheeler, by William E. Wheeler, for plaintiff-appellant.*

*Gaither, Gorham & Crone, by John W. Crone III; Sigmon, Sigmon & Isenhower, by C. Randall Isenhower, for defendant-appellee Don A. Abernethy.*

## TAYLOR v. ABERNETHY

[149 N.C. App. 263 (2002)]

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General John H. Watters, amicus curiae.*

HUNTER, Judge.

Harvey C. Taylor, Jr. ("plaintiff") appeals the entry of judgment upon a jury verdict that he does not have a valid contract entitling him to the estate of his deceased brother, Romer Gray Taylor ("Romer"), and the trial court's denial of his motion for a new trial. We conclude there was no error in part, and we reverse in part and remand for a new trial.

Plaintiff and Romer were raised in Burke County, North Carolina. Plaintiff later relocated to Pennsylvania where he obtained employment in the steel erection business. Romer, who never married nor had children, attempted to earn a living from his farm in Burke County. Plaintiff loaned money to Romer throughout the years. In 1958, Romer told plaintiff he wished to begin dairy farming, but would need additional land, which plaintiff owned. Romer asked plaintiff to sell him approximately twenty-nine acres of land in Burke County which plaintiff received at his grandfather's death. On 23 March 1958, Romer wrote to plaintiff, stating that in the event he should die, he wanted plaintiff to have everything he owned, and that he "plan[ned] to make a will to that effect very soon." Plaintiff conveyed the land to Romer in April 1958. Romer was not successful in dairy farming, and in the 1970's he moved to Pennsylvania where plaintiff employed him and allowed Romer to live in his home.

In 1978, Romer asked plaintiff to finance the purchase of a backhoe so that he could try again at farming. According to plaintiff, in consideration for the backhoe, Romer agreed to sign a contract to make a will that would leave his entire estate to plaintiff. At trial, plaintiff produced a contract dated 10 July 1978 providing that in consideration for plaintiff's having renounced his interest in his parent's estate in favor of Romer, and having agreed to purchase for Romer's use a backhoe for $38,000.00, Romer "agrees to immediately make a valid will devising to [plaintiff] and his heirs, assigns, and successors [his] entire estate." The contract bore plaintiff's signature, what plaintiff maintained to be Romer's signature, and the acknowledgment of a notary public. The contract was executed in Pennsylvania, and was not recorded in Burke County until 22 October 1997.

Romer died on 18 January 1998. On 23 January 1998, defendant Don A. Abernethy ("Abernethy"), plaintiff's and Romer's nephew,

offered for probate a handwritten document which he claimed to be Romer's holographic will. The document was dated 7 October 1997, and purported to leave Romer's entire estate to Abernethy. Abernethy was originally named executor of Romer's estate, but later withdrew. Defendant Jack C. Weir ("Weir") was thereafter named executor.

On 12 February 1998, plaintiff filed a complaint against Abernethy individually, and Weir as executor (collectively "defendants"), seeking specific performance of the 10 July 1978 contract to make a will, a temporary restraining order and a preliminary injunction requiring, among other things, that Abernethy return any of Romer's property he had taken following Romer's death, and that he be prohibited from taking possession of Romer's property. Defendants answered on 14 April 1998, denying the existence of any contract to make a will in favor of plaintiff. Additionally, Abernethy filed a counterclaim seeking compensation for services he rendered to Romer prior to his death. This counterclaim was dismissed on 28 August 2000 upon plaintiff's motion. Defendants moved to dismiss the complaint, which motion was denied 28 August 2000.

Plaintiff's case came to trial on 29 August 2000. Upon resting his case, plaintiff took a voluntary dismissal of his claims against Abernethy individually. The trial court thereafter allowed Abernethy to intervene in the action. On rebuttal, plaintiff called handwriting expert Charles Perrotta to testify to the validity of Romer's signature on the 10 July 1978 contract. The trial court permitted Perrotta to testify to his observations about similarities between the signature on the contract and exemplars of Romer's signature, but would not allow him to render an opinion on the authenticity of the signature on the 10 July 1978 contract.

Plaintiff moved for directed verdict at the close of all evidence. The trial court denied the motion and submitted a single issue to the jury: whether the signature on the 10 July 1978 contract was the genuine signature of Romer. The jury answered in the negative, whereupon the trial court entered judgment on 27 September 2000 concluding plaintiff is not entitled to recover from defendants. The trial court entered an order denying plaintiff's motion for a new trial on 9 February 2001. Plaintiff appeals.

Plaintiff brings forth eight assignments of error on appeal. However, we need not address all eight arguments, as we hold plaintiff is entitled to a new trial. Defendants bring forth a cross-assignment of error, arguing the trial court should have granted their

motion to dismiss plaintiff's action as barred by the statute of limitations. We hold the trial court did not err in allowing Abernethy to intervene in the action and to set aside an admission that Romer signed the 10 July 1978 contract to make a will. We hold the trial court erred in refusing to permit Perrotta to give an expert opinion as to whether the signature on the 10 July 1978 contract was Romer's, and that plaintiff is entitled to a new trial as a result. We reject defendants' assignment of error that the trial court should have dismissed plaintiff's action as untimely.

**[1]** By his first assignment of error, plaintiff argues the trial court erred in allowing Abernethy to intervene in the case after plaintiff had presented all of his evidence. Upon resting his case, plaintiff took a voluntary dismissal on his claims against Abernethy individually, thereby removing him as a party to the case. Upon plaintiff's dismissal, the trial court reminded Abernethy that he could move to intervene. Abernethy expressed his desire to do so, and the court permitted him to join as a party.

Motions to intervene are governed by N.C. Gen. Stat. § 1A-1, Rule 24 (1999). That statute provides that a party may intervene as of right where the applicant "claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest," provided that it would not be protected by existing parties. N.C. Gen. Stat. § 1A-1, Rule 24(a)(2). A party may also be permitted to intervene where the "applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." N.C. Gen. Stat. § 1A-1, Rule 24(b)(2).

Rule 24 "requires that an application to intervene be 'timely.'" *State ex rel. Easley v. Philip Morris, Inc.*, 144 N.C. App. 329, 332, 548 S.E.2d 781, 783 (citing N.C. Gen. Stat. § 1A-1, Rule 24), *disc. review denied and review dismissed*, 354 N.C. 228, 554 S.E.2d 831 (2001). In determining whether such a motion is timely, the trial court considers the following: " '(1) the status of the case, (2) the possibility of unfairness or prejudice to the existing parties, (3) the reason for the delay in moving for intervention, (4) the resulting prejudice to the applicant if the motion is denied, and (5) any unusual circumstances.' " *Hamilton v. Freeman*, 147 N.C. App. 195, 201, 554 S.E.2d 856, 859 (2001) (citation omitted). "A motion to intervene is rarely denied as

untimely prior to the entry of judgment, and may be considered timely even after judgment is rendered if 'extraordinary and unusual circumstances' exist." *Id.* at 201, 554 S.E.2d at 859-60 (citation omitted).

"Whether a motion to intervene is timely is a matter within the sound discretion of the trial court and will be overturned only upon a showing of abuse of discretion." *Id.* at 201, 554 S.E.2d at 859. We therefore review the trial court's decision to allow Abernethy to intervene for abuse of discretion, meaning that the court's "... 'actions are manifestly unsupported by reason. A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.' " *Easley*, 144 N.C. App. at 332, 548 S.E.2d at 783 (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)).

In the present case, the trial court found that Abernethy, as the beneficiary of a properly probated will giving him Romer's estate, would originally have been allowed to join the lawsuit as a party having an interest in the property had he not been named a party by plaintiff. The trial court found that the effect of plaintiff's voluntary dismissal was to deprive Abernethy of his ability to assert his interest in the property, and that allowing Abernethy to intervene simply placed him in the same position he was prior to plaintiff's voluntary dismissal. The trial court further determined Abernethy had sought affirmative relief in his pleadings, requesting that Romer's estate be distributed according to the holographic will which Abernethy offered for probate on 23 January 1998. The trial court observed that Weir and the estate had taken a "hands-off attitude," and "[h]a[d] not actively sought to represent the interest of [Abernethy]."

The trial court further determined Abernethy had no need to move to intervene prior to when he did because until the time plaintiff took a voluntary dismissal, Abernethy was an active party in the case. The court found that Abernethy timely moved to intervene as soon as he discovered he would not be a party. The trial court concluded there would be no prejudice to plaintiff as a result of the intervention because plaintiff had already conducted discovery with Abernethy's attorney, had received Abernethy's pleadings, and was fully aware of Abernethy's position on the issues. Nevertheless, in order to cure any possible prejudice, the trial court on more than one occasion gave plaintiff the opportunity to request a mistrial so that the parties could start over and conduct any further pretrial proce-

dure plaintiff deemed necessary. Plaintiff declined to request a mistrial, stating that he wished to proceed with the case. Further, the trial court gave plaintiff the opportunity to withdraw his statement that he rested his case so that he could present further evidence. Plaintiff declined to do so, reaffirming that he rested his case.

We hold the trial court did not abuse its discretion in allowing Abernethy to intervene. There is support in the record for the trial court's findings that Abernethy had an interest in the property, was seeking to have Romer's estate distributed according to the holographic will, and that his interest in defeating plaintiff's claim to Romer's estate was not being adequately represented by Weir as administrator of the estate. Further, we agree with the trial court that Abernethy's motion was timely in that he moved to intervene as soon as he discovered he would no longer be a party to the case. Plaintiff had more than one opportunity to cure any prejudice by requesting a mistrial, but declined to do so. This assignment of error is overruled.

[2] By his second assignment of error, plaintiff argues the trial court erred in permitting Abernethy to withdraw an admission that Romer had signed the 10 July 1978 contract to make a will. Plaintiff served requests for admissions on Abernethy on 14 January 2000, including a request that he admit Romer had signed the 10 July 1978 contract. Abernethy failed to respond to the requests within the required thirty days, serving his responses on plaintiff approximately ten days late. Abernethy denied the validity of Romer's signature in his responses. After Abernethy was permitted to intervene, the trial court allowed his motion to withdraw the prior judicial admission.

N.C. Gen. Stat. § 1A-1, Rule 36 (1999), governing requests for admissions, provides that a "matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter." N.C. Gen. Stat. § 1A-1, Rule 36(a). It further provides that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." N.C. Gen. Stat. § 1A-1, Rule 36(b). "[T]he court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or

defense on the merits." N.C. Gen. Stat. § 1A-1, Rule 36(b). "The trial court has discretion to allow a withdrawal of an admission upon a party's motion." *Shwe v. Jaber*, 147 N.C. App. 148, 151, 555 S.E.2d 300, 303 (2001).

In allowing Abernethy's motion to withdraw, the trial court found that he never intended to admit the validity of the signature, that plaintiff received his responses shortly after they were due, and that, in the interest of justice, Abernethy should not be deprived of his right to have a jury determine the issue. We find no abuse of discretion in this ruling. Abernethy's responses to plaintiff's requests for admissions, in which he denied the validity of Romer's signature, were provided to plaintiff only a few days after they were due, and approximately six months prior to trial. Moreover, it is clear that the presentation of the merits of the action, which essentially depended upon a determination of the signature's validity, would have been subserved had the trial court not permitted the withdrawal. Moreover, after the trial court allowed Abernethy's motion to withdraw, it once again gave plaintiff the opportunity to request that the trial court declare a mistrial in order to rectify any prejudice to plaintiff. Plaintiff declined to do so. This assignment of error is overruled.

[3] In his third argument, plaintiff maintains the trial court erred in refusing to permit handwriting expert Charles Perrotta to give his opinion on the validity of Romer's purported signature on the 10 July 1978 contract. We agree with plaintiff that the trial court erred in refusing to admit this evidence, and that the error was prejudicial, thereby warranting the grant of a new trial.

Plaintiff offered Perrotta as an expert in handwriting analysis for the purpose of providing the jury with an expert opinion on the validity of the 10 July 1978 contract. The trial court found Perrotta to be an expert for purposes of testifying to his observations about the characteristics of the signature on the 10 July 1978 contract as compared to genuine exemplars of Romer's signature; however, the trial court refused to allow Perrotta to render an expert opinion as to whether the signature on the 10 July 1978 contract was Romer's valid signature.

It appears from the record that the trial court considered Perrotta an expert in the field of handwriting analysis, but did not consider the methodology underlying handwriting analysis in general to be sufficiently reliable for Perrotta to give his opinion because it was not "scientific." Perrotta testified at length to his qualifications in the

field of handwriting analysis, stating that he had been in the field since 1975. Perrotta was extensively trained in the field by the FBI, for whom he was employed as a document examiner for several years. Perrotta, who holds a Masters Degree in Forensic Science, also worked for several years as a document examiner for the Mecklenburg County Police Department. He stated he has testified in the field of handwriting analysis 132 times, and that each time he has been accepted as an expert in that field. The trial court made clear that, in its opinion, plaintiff had clearly established Perrotta as well-trained and qualified in the field of handwriting analysis.

However, the trial court stated that its "issue and concern is not that [Perrotta] is trained or qualified." Rather, the court did not believe there "is any scientific evidence that [handwriting analysis] works, that it has been proven . . . [and] that there has been any kind of scientific examination of the ability of people using this methodology to arrive at the correct result." The court acknowledged that "handwriting analysis has been used for years," but stated that "I'm not aware of any scientific basis other than the fact that it's been used for years."

Perrotta also testified regarding his methodology, stating that he used a comparative methodology involving a comparison between a disputed document and genuine exemplars, and that this methodology is recognized, accepted, and employed by others in the field. He further testified that an expert with his similar training using the same methodology would come to the same conclusion about the authenticity of a particular document.

However, the trial court made clear that it did not believe Perrotta could give an opinion because handwriting analysis has not been *scientifically* proven to be accurate. The court stated: "the ultimate question about whether or not this is [Romer's] handwriting or not would have to have a scientific basis"; there is no evidence that "handwriting analysis as a science has ever been proven to be accurate or reliable by any kind of scientific study"; "[s]cientifically, I don't have a basis for [Perrotta] to [give his opinion]"; "I don't have a scientific basis for [Perrotta] to draw a conclusion."

The trial court concluded Perrotta could testify as a person who has knowledge of the characteristics of handwriting, but that he could not give an opinion because the court "simply do[es] not have any scientific basis to conclude that [Perrotta] can answer the ultimate question about is this signature Romer Taylor's." The trial court

reasoned that there is no scientific evidence that handwriting analysis "is a valid way to determine anything," and "an expert witness is supposed to testify as to scientific fact."

In fact, ". . . 'North Carolina case law requires only that the expert be better qualified than the jury as to the subject at hand, with the testimony being "helpful" to the jury.' " *State v. Jones*, 147 N.C. App. 527, 544, 556 S.E.2d 644, 654 (2001) (citations omitted); *see also Beam v. Kerlee*, 120 N.C. App. 203, 215, 461 S.E.2d 911, 920 (1995) (under Rules of Evidence, "an expert may testify in the form of an opinion if the testimony will help the trier of fact understand the evidence"), *cert. denied*, 342 N.C. 651, 467 S.E.2d 703 (1996). While it is certainly true that the trial court must act as gatekeeper in determining the reliability of expert testimony being offered, there is simply no requirement that a party offering the testimony must produce evidence that the testimony is based in science or has been proven through scientific study.

Our Rules of Civil Procedure make clear that expert testimony may be based not only on scientific knowledge, but also on technical or other specialized knowledge not necessarily based in science. N.C. Gen. Stat. § 8C-1, Rule 702(a) (1999) ("[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion"). The rules clearly provide that an expert who testifies to any of the matters permitted under Rule 702, including testimony based on specialized knowledge, is entitled to give an opinion based upon that knowledge. *See* N.C. Gen. Stat. § 8C-1, Rule 702(a); N.C. Gen. Stat. § 8C-1, Rule 705 (1999) ("[t]he expert may testify in terms of opinion or inference and give his reasons therefor"). This opinion may be rendered even though it amounts to an expert opinion on the ultimate issue to be determined by the jury. *See* N.C. Gen. Stat. § 8C-1, Rule 704 (1999) ("[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact"); *State v. Teague*, 134 N.C. App. 702, 708, 518 S.E.2d 573, 577 (1999) (experts may render opinion on ultimate issue to be determined by jury), *appeal dismissed and cert. denied*, 351 N.C. 368, 542 S.E.2d 655 (2000).

In its role as gatekeeper, the pertinent question for the trial court is not whether the matters to which the expert will testify are

scientifically proven, but simply whether the testimony is sufficiently reliable. *See Daubert v. Merrell Dow*, 509 U.S. 579, 125 L. Ed. 2d 469 (1993) ("general acceptance" test of admissibility for scientific evidence no longer applicable; test is whether methodology underlying testimony is sufficiently valid and reliable); *see also, Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238 (1999) (holding *Daubert's* general "gatekeeping" obligation of determining reliability applies not only to scientific knowledge, but also to technical or other specialized knowledge). Our Supreme Court, citing *Daubert*, has set forth the proper analysis for our courts in determining the admissibility of expert testimony, including technical or other specialized knowledge. *See State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995).

According to *Goode*, when faced with the proffer of expert testimony, the trial court must first "determine whether the expert is proposing to testify to scientific, technical, or other specialized knowledge that will assist the trier of fact to determine a fact in issue." *Id.* at 527, 461 S.E.2d at 639. This requires a preliminary assessment of whether the basis of the expert's testimony is "sufficiently valid and whether that reasoning or methodology can be properly applied to the facts in issue." *Id.; see also State v. Berry*, 143 N.C. App. 187, 203-04, 546 S.E.2d 145, 156-57, *disc. rev. denied*, 353 N.C. 729, 551 S.E.2d 439 (2001). In making this determination of reliability, our Supreme Court noted that our courts have focused on the following indicia of reliability: ". . . 'the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked "to sacrifice its independence by accepting [the] scientific hypotheses on faith," and independent research conducted by the expert.' " *Id.* at 528, 461 S.E.2d at 640 (citations omitted).

It is clear under *Goode* that the admissibility of expert testimony is not dependent upon its having a scientific basis. Under the *Goode* analysis, expert testimony may be deemed to be reliable notwithstanding that it is not based in science. We therefore conclude the trial court committed an error of law in refusing to permit Perrotta to render an expert opinion on the basis that handwriting analysis is not based in science and has not been scientifically proven. The trial court's proper inquiry must be guided by the factors set forth in *Goode*, which simply require that the expert's testimony be sufficiently reliable.

Moreover, nothing in *Daubert* or *Goode* requires that the trial court re-determine in every case the reliability of a particular field of specialized knowledge consistently accepted as reliable by our courts, absent some new evidence calling that reliability into question. Our courts have consistently held expert testimony in the field of handwriting analysis to be admissible. *See, e.g., State v. LeDuc*, 306 N.C. 62, 68-69, 291 S.E.2d 607, 611-12 (1982) (noting our courts have repeatedly allowed experts "to testify on the authenticity of a given handwritten document if he qualified because of his skill in handwriting analysis," and stating expert witness may "compare[] the handwriting on the contested document with a genuine standard. Based on this comparison he gives his opinion on the authenticity of the contested document"), *overruled on other grounds, State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987); *State v. Horton*, 73 N.C. App. 107, 111-12, 326 S.E.2d 54, 56 (1985) (expert witness in handwriting analysis permitted to give opinion on validity of disputed document); *In re Ray*, 35 N.C. App. 646, 647-48, 242 S.E.2d 194, 195 (1978) (expert witness in field of handwriting analysis permitted to testify to observations concerning handwriting on contested will and exemplars of decedent's writing and to render opinion on the ultimate issue of whether deceased had written will).

Applying the *Goode* factors to the present case, we hold the trial court erred in refusing to allow Perrotta to render an expert opinion. The record sufficiently establishes that Perrotta's testimony meets the four indicia of reliability set forth in *Goode*. Perrotta testified about his comparative methodology, that it is an established, recognized, and accepted technique used by many in the field of handwriting analysis, and that it is reliable in that someone with his qualifications employing the same methodology would come to the same conclusions. Perrotta's professional background in the field, dating back to 1975, is extensive, and the trial court acknowledged that he was well-trained and qualified in the field. Moreover, Perrotta used various visual aids and enlargements of Romer's handwriting and signature in explaining to the jury his observations about the signature on the 10 July 1978 contract as compared to genuine exemplars. He has also had extensive study in the field of handwriting analysis independent of his testimony in this case. We further believe that the trial court's error in determining the admissibility of Perrotta's opinion testimony prejudiced plaintiff to the extent that he is entitled to a new trial. Perrotta was prepared to give an expert opinion on the ultimate fact at issue, whether the signature on the 10

TAYLOR v. ABERNETHY

[149 N.C. App. 263 (2002)]

July 1978 contract was Romer's. Given the weight which the jury could have afforded an opinion given by an expert with Perrotta's qualifications, plaintiff is entitled to have the jury consider this testimony.

**[4]** Finally, we address defendants' cross-assignment of error to the trial court's denial of their motion to dismiss plaintiff's complaint as barred by Pennsylvania's six-year statute of limitations. Defendants argue that the statute of limitations began to run on plaintiff's cause of action as soon as the contract was executed because it provided that Romer would "immediately" make a will leaving his estate to plaintiff, which he did not do. However, under Pennsylvania law, a cause of action for breach of an agreement to make a will begins to run at the death of the party agreeing to devise. *See Zimnisky v. Zimnisky*, 210 Pa. Super. 266, 270, 231 A.2d 904, 906 (1967) (agreement to make a will is not testamentary in nature, but is a contract "with part performance postponed until the death of one of the parties"); *In Re Hofmann's Estate*, 64 Pa. D. & C. 575, 64 Monag. 194 (1948) (measuring damages for breach of contract to make a will from point of death, not execution of contract).[1]

In summary, we hold the trial court did not err in permitting Abernethy to intervene in this action, and to withdraw his judicial admission to the validity of Romer's signature on the 10 July 1978 contract. We hold the trial court erred in assessing the admissibility of Perrotta's expert opinion as to the validity of the signature on the 10 July 1978 contract, and in refusing to permit Perrotta to render an expert opinion, which errors require the grant of a new trial. We reject defendants' argument that plaintiff's action was time-barred, and we need not address plaintiff's remaining five assignments of error.

No error in part; reversed in part and remanded for new trial.

Judges GREENE and TYSON concur.

---

1. Even though Pennsylvania law applies to this issue, we note the law in this State appears to be the same. *See Rape v. Lyerly*, 287 N.C. 601, 620, 215 S.E.2d 737, 749 (1975) (three-year statute of limitations on breach of contract to devise property does not run until death of party who agreed to devise).