***********
The Full Commission reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Dollar, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Decision and Order and enters the following Decision and Order.
 *********** EVIDENTIARY RULINGS
Plaintiff filed a Motion to Supplement the Record on Appeal. Defendant responded that they had no objection to this motion. Therefore, plaintiffs' Motion to Supplement the Record on Appeal is GRANTED and the evidence that plaintiffs filed an election of remedies on 2 March 2001 under the federal statutory scheme is received into the evidentiary record of this matter.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in their Pre-Trial Agreement, filed on August 9, 2002, and at the hearing before the deputy commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Childhood Vaccine-Related Injury Compensation Program, N.C. Gen. Stat. § 130A-422, etseq., at all relevant times.
2. Hayden L. Goetz was born on May 14, 1993, the first child of Andrew and Catherine Goetz, at Durham Regional Hospital, in Durham, North Carolina.
3. On delivery, Hayden had Apgar scores of nine out of ten at one minute and nine out of ten at five minutes.
4. On July 6, 1993, at the age of two months, the Petitioners took Hayden to Durham Pediatrics in Durham, North Carolina, for his check-up and DPT shot.
5. Hayden was administered a DPT vaccine manufactured by the Respondent's predecessor Lederle Labs, under the trade name "Tetramune," in lot number 352922.
6. On August 31, 1993, Petitioners returned to the pediatrician's office for Hayden's second DPT shot.
7. The second shot was manufactured by Respondent's predecessor Lederle Labs under the name "Tetramune," in lot number 352922.
8. Hayden received his third DPT shot on November 19, 1993, at the office of the pediatrician. Hayden was given Tylenol before the vaccination, per the doctor's suggestion.
9. This shot was manufactured by Respondent's predecessor Lederle Labs under the name "Tetramune," in lot number 388984.
10. Petitioners presented this claim to the Secretary of Health and Human Services pursuant to the Public Health Services Act in March 1999. On January 25, 2001, the U.S. Court of Appeals for the Federal Circuit ordered the case dismissed as having been filed outside the statutory time limit of42 U.S.C. § 300aa-16.
11. The parties stipulate that the damages sustained by Hayden Goetz in lost income, loss of future earnings, and pain and suffering, exceed the statutory amount of damages allowed ($300,000.00).
12. The issue for determination is whether plaintiff Hayden Goetz sustained a vaccine-related injury, and if so, to what amount of damages is he entitled under the Childhood Vaccine-Related Injury Compensation Program.
13. The parties stipulated the following into evidence:
a. Prenatal, labor and delivery records for Catherine Goetz, pp. 1 — 15;
b. Medical Records of Hayden Goetz, pp. 16 — 541;
c. Letter of Dr. Jerry Wiley, pp. 542 — 543;
d. Letter of Dr. Kevin Ryan, p. 544;
e. Letter of Dr. Samuel Katz, p. 545;
f. Life Care Plan for Hayden Goetz, pp. 546 — 551;
g. C.V. of Dr. Jerry Wiley, pp. 552 — 557;
h. Commonly Asked Questions about the National Vaccine Injury Compensation Program, pp. 558 — 568;
i. Affidavit of Dr. Douglas Clark;
j. Videotapes and Deposition transcripts for:
1) Dr. Samuel L. Katz;
2) Dr. Kurt Klinepeter;
3) Dr. Amy S. Holmes;
4) Dr. Allan D. Lieberman; and,
k. Videotape of Hayden Goetz.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Andrew and Catherine Goetz are the parents of Hayden L. Goetz, who was born on May 14, 1993. There were no significant complications during the pregnancy. Labor was induced due to concerns about decreased fetal movement and the development of placental calcification. However, Hayden was a full-term baby at the time of caesarian delivery.
2. Apgar Scores are measured at one minute after birth and five minutes after birth. They are a measure of heart rate, color, tone, reflex irritability, and respiratory rate. A child born mentally retarded or autistic could have normal Apgar Scores. On delivery, Hayden had Apgar scores of nine out of ten at one minute and nine out of ten at five minutes.
3. Hayden received various immunizations during his early months, including two doses of the Hepatitis B vaccine, four doses of the Diptheria/Pertussis/Tetanus (DPT) vaccine, the Measles/Mumps/Rubella vaccine and the polio vaccine.
4. Hayden received the first DPT injection on July 6, 1993. Dr. Douglas Clark, of Durham Pediatrics, administered the shot. Later that evening, Hayden experienced swelling at the site of the injection, was fussy and irritable, and had a fever of 103 degrees. Mrs. Goetz telephoned Durham Pediatrics and was advised to give Hayden Tylenol and to place him in a cool bath to reduce the fever. The Goetzes administered the recommended treatments, and Hayden's fever later subsided.
5. Hayden received the second DPT injection on August 31, 1993, administered by Durham Pediatrics. That evening, the child awoke screaming with a fever of 104 degrees. His parents once again administered Tylenol and a cool bath to reduce the fever. After the symptoms continued, they phoned Durham Pediatrics and were instructed to take him to the emergency room if the fever and screaming did not subside within three hours. Hayden subsequently passed out or fell asleep on his father's shoulder prior to the three-hour period suggested by Durham Pediatrics. Thus, the Goetzes did not take him to the emergency room.
6. Prior to Labor Day of 1993, Hayden's paternal grandparents became concerned about Hayden's development. They observed that the child appeared disoriented, limp, and lethargic. They also noted that he did not push back when placed on their shoulders, as he had done previously, and no longer reacted to his surroundings. They expressed their concerns to Catherine and Andrew Goetz. Hayden's parents also observed that he did not appear to be developing like other children his age.
7. From on or about 4 October 1993, pediatrician Dr. Douglas Clark noted Hayden began to develop multiple upper respiratory, ear, throat, and bronchi infections, as well as Coxsackie virus and chicken pox.
8. Prior to the November 19, 1993, DPT injection, Hayden's parents contacted the pediatrician and were instructed to give him Tylenol before the appointment to minimize reaction to the shot, which they did. On November 19, 1993, Hayden received his third DPT injection, and the pediatrician suggested Hayden's parents also give their child Motrin following the shot. Upon returning home, Hayden developed a fever of 101 degrees.
9. The records of Durham Pediatrics do not indicate any type of reaction to either the first or the second DPT shot. However, their records indicate that after the third shot, the child was fussy and had a fever for more than 24 hours. The Full Commission finds that the lack of notation by Durham Pediatrics regarding any reactions following the first and second shot to be non-determinative. It is reasonably foreseeable that a busy pediatric practice may not have the time or resources to note each and every call received from the parents of its patients. Moreover, the Full Commission finds the testimony of Hayden's parents to be credible regarding the events that occurred surrounding the administration of the DPT vaccinations to Hayden.
10. By February 16, 1994, the pediatrician noted Hayden had some developmental delays; and by 16 September 1994, Hayden's development was noted as continuing to deviate from the norm.
11. Hayden has received evaluations from a variety of medical experts, in an attempt to diagnose his condition and recommend possible treatment.
12. On May 26, 1994, Dr. Michael Tennison of UNC Hospitals' Neurology Department and Clinical Center for the Study of Development and Learning/Child Development Institute evaluated Hayden's development. A brain MRI revealed a thin corpus callosum and peripheral decreased myelination. Following extensive testing and evaluation by an interdisciplinary team at the Clinical Center for the Study of Development and Learning, Hayden was diagnosed with developmental delay and a static encephalopathy with no known cause. During the course of the evaluations, Hayden's parents related the history of the vaccine reactions, Dr. Tennison noted that the child screamed for more than 30 minutes following the third DPT vaccination.
13. Dr. Allan J. Lieberman, a pediatrician and occupational and environmental medicine specialist, examined Hayden on August 12, 1997. During the course of the evaluation, Dr. Lieberman performed challenge testing, which is a form of allergy testing in which a subject is exposed to specific antigens in order to determine whether an allergy is present. Dr. Leiberman testified that he employed this type of test because of Hayden's young age and the difficulty of working with him. The testing indicated that Hayden had an allergic reaction to the bacillus pertussis, or the whooping cough bacteria in the DPT vaccine. Dr. Lieberman opined that Hayden had post-immunization encephalopathy related to the DPT vaccine. Dr. Lieberman further opined the high-pitched cry exhibited by Hayden was a sign of central nervous system injury. Dr. Lieberman based his diagnosis on his testing and the temporal relationship between Hayden's vaccine and his arrested development.
14. Dr. Kurt Klinepeter, an expert in neurodevelopment pediatrics at Bowman Gray School of Medicine, examined Hayden on March 24, 1998. Dr. Klinepeter opined that to a reasonable degree of medical certainty, he had no opinion as to the etiology of Hayden's condition, only that Hayden had a mental deficiency with particular weakness in expressive language skills.
15. Dr. Jerry Wiley is a former pediatrician who now works as a medical consultant with the North Carolina Division of Public Health and has helped administer the Childhood Vaccine Injury Program since its inception. Dr. Wiley evaluated Hayden's case based on the child's medical records and concurred with Dr. Tennison's diagnosis of Hayden's condition as a static encephalopathy. He defined encephalopathy as a pathology of the brain, meaning that the brain is not functioning as it should. "Static" in this instance means the condition will not worsen or improve. He opined that Hayden is moderate to severely mentally retarded with a deficit in expressive language.
16. Dr. Wiley opined that there is nothing in the clinical record that gives an indication that Hayden developed encephalopathy as a result of the vaccine. However, he opined that a two-month old child, such as Hayden, with a fever of 102 degrees or greater should be seen by a pediatrician regardless of whether a vaccine has been given or not, just to rule out any possible infection.
17. Dr. Samuel L. Katz evaluated Hayden's case based on a case report from the Immunization Branch of the Department of Health and Human Services. Dr. Katz is a trained pediatrician with 45 years of experience working with vaccines in clinical and investigative studies. He was a member of the Vaccine Injury Compensation Commission and assisted in developing this program.
18. Dr. Katz testified there was no indication that Hayden had an encephalopathy. Dr. Katz stated vaccinations are generally given at 2 months, 4 months, 6 months and 12 months, which are also the times when signs of developmental disorders begin appearing. He stated that there may be a temporal relation, but that does not translate to a causal relation. Therefore, it is Dr. Katz opinion that Hayden's developmental disorder is not causally related to the DTP, but is rather a global developmental delay, which is a condition that has no known cause in the majority of the cases so diagnosed. Because Dr. Katz failed to concur in the findings of Doctors Tennison, Leiberman, and Wiley (that Hayden suffers from static encephalopathy), the Full Commission gives little weight to the testimony of Dr. Katz.
19. Dr. Amy S. Holmes, an oncologist who now operates a practice specializing in autistic children, evaluated Hayden on October 4, 2000. It is her opinion that Thimerasol, a preservative derived from ethyl mercury and used in vaccines, causes autism. It is her opinion based on the history given to her by Hayden's parents that Hayden suffers from an autistic spectrum disorder that resulted from mercury toxicity from the childhood vaccines.
20. Dr. Lieberman stated that Hayden does not show the symptoms of an autistic child, rather his symptoms are that of mental retardation. Furthermore, none of the other physicians that have treated or evaluated Hayden have diagnosed the child with autism. Therefore, little weight is given to the testimony of Dr. Holmes.
21. In evaluating the medical evidence of record, it is clear that Doctors Tennison, Lieberman, and Wiley all concur that Hayden suffers from static encephalopathy. However, Dr. Lieberman is the only physician to give an opinion as to the etiology of the child's condition. Based upon the challenge testing performed on Hayden by Dr. Lieberman, which indicated Hayden had an allergic reaction to the bacillus pertussis, Dr. Lieberman opined that Hayden's encephalopathy was related to the DPT vaccine. Dr. Wiley disagreed with Dr. Lieberman's challenge testing method. Dr. Wiley testified that the challenge testing approach would only be valid if it were correlated with clinical findings. However, the Full Commission finds Dr. Lieberman's challenge testing method to be sufficiently valid and reliable, and properly applied to the facts at issue. Thus, the Full Commission gives greater weight to the testimony of Dr. Leiberman as opposed to Dr. Wiley.
22. Based on the evidence of record, the Full Commission finds that plaintiffs' child, Hayden, sustained a vaccine-related injury when he had an allergic reaction to the bacillus pertussis contained in the DPT vaccines given to him on July 6, August 31, and November 19, 1993, which caused him to suffer from a static encephalopathy that was a direct and proximate result of the DPT vaccines.
23. In finding that plaintiffs' child, Hayden, sustained a vaccine-related injury, the Full Commission deems it appropriate to remand this matter to a deputy commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of a Decision and Order with findings regarding the compensatory damages that plaintiffs are entitled to recover.
Statute of Limitations
24. In March 1999, plaintiffs filed a claim under 42 U.S.C. § 300aa, the Federal Vaccine Related Injury Compensation Program. On January 25, 2001, the U.S. Court of Appeals for the Federal Circuit ordered the case dismissed, as having been filed outside the statutory time of42 U.S.C. § 300aa-16, which is a period of three years from the date of the vaccinations. As Hayden received his vaccinations in 1993, even using the dates of his second or third shot, plaintiffs' claim would have been outside the federal statutory period for filing a claim. However, the North Carolina Childhood Vaccine Injury Compensation statute allows claims to be filed six years from the date of the administration of the vaccine alleged to have caused the injury. It also requires that plaintiffs first seek federal relief before pursuing relief under the North Carolina Childhood Vaccine Injury Compensation Program.
25. During the time plaintiffs' petition was pending before Federal Court, the tolling provisions of the North Carolina Childhood Vaccine Related Injury Compensation Program were in effect. Once the Federal Circuit ordered the case dismissed on January 25, 2001, plaintiffs were allowed by statute an additional 120 days to file under the North Carolina Childhood Vaccine Related Injury Compensation Program.
26. On March 2, 2001, plaintiffs filed their Election to File a Civil Action pursuant to 42 U.S.C. § 300aa 21(a) in the United States Court of Federal Claims which satisfies the statutory requirements of the North Carolina Childhood Vaccine Related Injury Compensation Statute.
27. Plaintiffs prepared an I.C. Form V-1, Claim for Damages Under Childhood Vaccine-Related Injury Compensation Program on or about February 26, 2001, and filed the same with the North Carolina Industrial Commission on March 2, 2001, which was within the 120 days allowed by the North Carolina Childhood Vaccine Related Injury Compensation Statute.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Pursuant to N.C. Gen. Stat. § 130A-429(a), any claim under the Vaccine-Related Injury statute that is filed more than six years after the administration of a vaccine alleged to have caused a vaccine-related injury is barred. However, this state statute of limitations is tolled during the pendency of a claim filed pursuant to the federal statutory scheme. N.C. Gen. Stat. § 130A-429. Plaintiffs filed their claim within 120 days of the judgment by federal court; thus, this claim is within the tolling provision of the state statute of limitations. Id.
2. On March 2, 2001, plaintiffs filed their Election to File a Civil Action pursuant to 42 U.S.C. § 300aa 21(a) in the United States Court of Federal Claims which satisfies the requirements of N.C. Gen. Stat. §130A-425(b).
3. The parties are properly before this Commission and the Commission has jurisdiction to decide this case under the Vaccine Injury Compensation Act. N.C. Gen. Stat. § 130A-422.
4. In order to recover benefits under the Vaccine Injury Compensation Act, plaintiffs must prove a causal relation between the vaccine and the injury. N.C. Gen. Stat. § 130A-426. Doctors Tennison, Lieberman, and Wiley all concur that Hayden suffers from a static encephalopathy. Dr. Lieberman has further shown, through the use of challenge testing, that Hayden had an allergic reaction to the bacillus pertussis, which caused him to suffer from a static encephalopathy. In determining whether to accept Dr. Lieberman's challenge testing methodology, the Full Commission takes note of the Court of Appeal's analysis of the issue of expert testimony in Taylor v. Abernethy, 149 N.C.App. 263, 560 S.E.2d 233
(2002):
 In its role as gatekeeper, the pertinent question for the trial court is not whether the matters to which the expert will testify are scientifically proven, but simply whether the testimony is sufficiently reliable. See Daubert v. Merrell Dow, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) (`general acceptance' test of admissibility for scientific evidence no longer applicable; test is whether methodology underlying testimony is sufficiently valid and reliable); see also, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) (holding Daubert's general `gatekeeping' obligation of determining reliability applies not only to scientific knowledge, but also to technical or other specialized knowledge). Our Supreme Court, citing Daubert, has set forth the proper analysis for our courts in determining the admissibility of expert testimony, including technical or other specialized knowledge. See State v. Goode, 341 N.C. 513, 461 S.E.2d 631
(1995).
 According to Goode, when faced with the proffer of expert testimony, the trial court must first `determine whether the expert is proposing to testify to scientific, technical, or other specialized knowledge that will assist the trier of fact to determine a fact in issue.' Id. at 527, 461 S.E.2d at 639. This requires a preliminary assessment of whether the basis of the expert's testimony is `sufficiently valid and whether that reasoning or methodology can be properly applied to the facts in issue. Id.; see also State v. Berry, 143 N.C. App. 187, 203 — 04, 546 S.E.2d 145, 156 — 57, disc. rev. denied, 353 N.C. 729, 551 S.E.2d 439
(2001).
Id. In the present case, Dr. Lieberman's challenge testing method is sufficiently reliable, and properly applied to the facts at issue. Moreover, it is clear from Dr. Lieberman's testimony that the challenge testing method is supported by his specialized knowledge in pediatric occupational and environmental medicine, and the routine use of this particular testing method in his practice. Id.
5. Plaintiffs are entitled to damages for a vaccine-related injury sustained by their child, Hayden, when he had an allergic reaction to the bacillus pertussis contained in the DPT vaccines given to him on July 6, August 31, and November 19, 1993, which caused him to suffer from a static encephalopathy that was a direct and proximate result of the DPT vaccines. N.C. Gen. Stat. § 130A-426.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. This matter is hereby remanded to Chief Deputy Commissioner Stephen T. Gheen for assignment to a Deputy Commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of a Decision and Order with findings regarding the compensatory damages that plaintiffs are entitled to recover.
2. Defendants shall pay costs.
This 2nd day of August 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER